**In re SEEBEYOND TECHNOLOGIES CORPORATION SECURITIES LITIGATION**

Nos. CV 02–05330 DDPFMOX, CV 02–05721 DDPFMOX, CV 02–05760 DDPFMOX, CV 02–05890DDPFMOX, CV 02–05927DDPFMOX, CV 02–05952DDPFMOX, CV 02–06052DDPFMOX, CV 02–06204DDPFMOX, CV 02–06264DDPFMOX.

United States District Court, C.D. California.

May 28, 2003.

William S Lerach, Darren J Robbins, Milberg Weiss Bershad Hynes & Lerach,

San Diego, CA, Marc A Topaz, Schiffrin & Barroway, Bala Cynwyd, PA, Paul J Geller, Cauley Geller Bowman & Coates, Boca Raton, FL, for Plaintiffs.

## ORDER GRANTING IN PART THE DEFENDANTS' MOTION TO DISMISS

PREGERSON, District Judge.

This matter comes before the Court on the defendants' motion to dismiss. After reviewing and considering the materials submitted by the parties, the Court grants the defendants' motion in part.

## BACKGROUND

This is a securities class action lawsuit against SeeBeyond Technologies Corporation ("SeeBeyond"), and three of its officers and directors (the "individual defendants").[1] Defendant SeeBeyond provides business-integration software that facilitates the real-time flow of information within companies and among companies' customers, suppliers, and partners through the integration of business processes and systems. SeeBeyond derives revenue from three primary sources: licenses, services, and maintenance.

The plaintiffs are a class of investors who bought SeeBeyond's publicly-traded stock between December 10, 2001, and May 7, 2002, inclusive (the "Class Period"). The plaintiffs filed suit when the price of SeeBeyond's stock dropped following its April 22, 2002, announcement of a revenue shortfall.

The lead plaintiff, Fuller & Thaler Asset Management (referred to generally as the "plaintiff"), asserts a cause of action against SeeBeyond and the individual defendants under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (" '33 Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (" '34 Act"), and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated under Section 10(b) by the Securities and Exchange Commission ("SEC"). The action is brought on behalf of all persons who purchased or acquired shares of SeeBeyond common stock during the Class Period.

The plaintiff's causes of action arise from a series of events leading up to and during the Class Period.[2] SeeBeyond went public in May 2000 at a price of $12 per share, under the name Software Technologies. (Am.Consol.Compl.¶ 3.) By the Summer of 2000, SeeBeyond's stock was trading at more than $30 per share. (Id.) Although integration software companies continued to thrive after the technology bubble burst in the Spring of 2000, such companies began to disappear or slow their expansions shortly thereafter. (Id. ¶¶ 3, 4.)

The plaintiff alleges that SeeBeyond senior management attempted to compensate for this decline in business by regularly engaging in improper revenue recognition practices, such as improperly "pulling" revenue from future quarters in order to meet financial estimates. (Id. ¶ 4.) According to a former SeeBeyond account/engagement manager employed by

---

1. The individual defendants are: James T. Demetriades ("Demetriades"), CEO, president, and a director of SeeBeyond during the Class Period; Barry J. Plaga ("Plaga"), the company's CFO and senior vice president of finance during the Class Period; and Raymond J. Lane ("Lane"), chairman of the company's board of directors during the Class Period.

2. The plaintiff bases its allegations principally on the accounts of confidential sources of information. (Am.Consol.Compl.¶¶ 4–6, 25, 61–63, 67–68, 80, 126.) These confidential sources are partially identified as an account/engagement manager, professional services at SeeBeyond; a program manager at SeeBeyond; and a former executive at SeeBeyond (UK) Ltd. (Karam's Decl. at 1.)

the company shortly before the start of the Class Period in 2001, Ernst & Young ("E & Y"), the company's outside auditors, frequently challenged the numbers provided by the defendants during analyst conference calls. (*Id.*) The plaintiff alleges that it was common knowledge among SeeBeyond employees that after such conference calls, E & Y would meet with defendant Demetriades in his office and admonish him for providing inaccurate numbers. (*Id.*)

The plaintiff also alleges that in order to generate revenue, SeeBeyond sold defective software that its management knew was not ready to be released. (*Id.* ¶ 5.) The plaintiff alleges that as a result of these product defects, customers frequently refused to pay for their purchases, causing SeeBeyond's accounts receivable to grow. (*Id.*)

As early as December 10, 2001 (the first day of the Class Period), analysts began reporting SeeBeyond's representations that the company was "on track" to meet fourth-quarter targets because it had rapidly instituted cost-cutting adjustments to counter an otherwise negative market. (*Id.* ¶ 10.) The plaintiff alleges that the defendants knew or recklessly disregarded that the cost-cutting steps the company had instituted were insufficient to make SeeBeyond profitable. (*Id.*)

According to the plaintiff, the improper recognition of revenue at SeeBeyond began before the Class Period. The plaintiff alleges that in late 2000, after SeeBeyond entered into a multi-year contract with General Motors ("GM"), senior management deferred recognition of approximately $2.5–3 million from the contract into the first quarter of 2001. (*Id.* ¶ 6.) The plaintiff alleges that SeeBeyond's senior management then attempted to improperly recognize all revenue on the GM contract during the first quarter, even though the contract was to be performed over a number of years. (*Id.*) According to the plaintiff's allegations, SeeBeyond management backed down only when E & Y threatened to publicly reveal this deviation from generally accepted accounting principles ("GAAP"). (*Id.*)

The plaintiff challenges statements made in SeeBeyond's February 8, 2002 annual 10–K filing, which reported fourth-quarter and year-end results for 2001. (*Id.* ¶ 113.) The plaintiff alleges that these statements were false and misleading, in violation of Section 11 of the '33 Act. 15 U.S.C. § 77k. The plaintiff also challenges statements made by the defendants summarizing SeeBeyond's fourth-quarter 2001 financial results in a press release distributed on January 24, 2002, and a conference call with analysts on the same day. (*Id.* ¶ 12.) The plaintiff alleges that the defendants knew, or recklessly disregarded, that these statements were materially false and misleading because the financial results were inflated due to the improper recognition of $2 million in revenue by the company's SeeBeyond (UK) Ltd. subsidiary in connection with a contract with Syngenta International AG. (*Id.* ¶ 14.)

The plaintiff also challenges statements made in SeeBeyond's February 8, 2002 amended Registration Statement and Prospectus for the sale of 7 million shares of common stock. (*Id.* ¶ 15.) The plaintiff claims that the final Registration Statement and Prospectus, dated February 21, 2002, also contained materially false and misleading financial results for Q4'01. (*Id.*) Further, the plaintiff challenges certain of the defendants' statements concerning first-quarter 2002 financial results in a press release and conference call on April 1, 2002. The plaintiff claims that the statements were false because the defendants failed to disclose that SeeBeyond's first-quarter 2002 financial results were

adversely impacted by customer dissatisfaction with SeeBeyond's products and increased competition. (*Id.* ¶¶ 17, 124–26.)

The plaintiff also challenges the defendants' failure to disclose for three weeks a revenue shortfall indicated by E & Y. (*Id.* ¶ 21.) The plaintiff further challenges, as materially false and misleading, statements made in the disclosure of this shortfall on April 22, 2002. (*Id.* ¶ 22.) The plaintiff also challenges statements made by defendants Demetriades and Plaga during a conference call with analysts on April 22, 2002. (*Id.* ¶¶ 24–28.)

Following the disclosure on April 22, 2002 of SeeBeyond's revenue shortfall, the company's stock price dropped sharply. (*Id.* ¶ 23.) The Class Period culminated on May 7, 2002, when the *Wall Street Journal* reported that in the April 22, 2002 conference call, defendants Demetriades and Plaga concealed SeeBeyond's improper recognition of revenue, as well as the involvement of E & Y in subsequent relevant events. (*Id.* ¶ 29.) The price of SeeBeyond's stock dropped again, and this lawsuit followed.

The complaint charges the individual defendants as "controlling persons" within the meaning of Section 15 of the '33 Act and Section 20(a) of the '34 Act. 15 U.S.C. § 78t–1. The plaintiff also alleges that the individual defendants acted with scienter in that they knew, and deliberately and recklessly disregarded, that the statements issued or disseminated in the name of SeeBeyond were materially false and misleading. (*Id.* ¶ 176.)

The defendants have filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the 1995 Private Securities Litigation Reform Act (the "PSLRA").

## DISCUSSION

### A. *Legal Standard*

#### 1. *Federal Rule of Civil Procedure 12(b)(6)*

Dismissal under Rule 12(b)(6) is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. *Newman v. Universal Pictures*, 813 F.2d 1519, 1521–22 (9th Cir.1987). The court must view all allegations in the complaint in the light most favorable to the non-movant and must accept all material allegations—as well as any reasonable inferences to be drawn from them—as true. *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir.1983).

#### 2. *Federal Rule of Civil Procedure 9(b) and the PSLRA*

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

> Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [parties] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."

*Bly–Magee v. California*, 236 F.3d 1014, 1018 (9th Cir.2001) (quoting *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir.1996)). Rule 9(b) is intended (1) to afford the party against whom the charge is made notice of the basis for the claim, (2) to safeguard the accused's reputation and goodwill from improvident charges of

wrongdoing, and (3) to inhibit the institution of strike suits. *See IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993). While the requirements of particularity may differ with the facts of each case, the claimant usually must allege the time, place, and content of the statements, the individuals who made the statements, the resulting injury, and the method of communication. *See* 2 James William Moore, *Moore's Federal Practice* § 9.03[1][b] (3d ed.2001) (citing, among others, *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547 n. 7 (9th Cir. 1994)).

■ The PSLRA "modifies this requirement, providing that a securities fraud complaint shall identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed. *See* 15 U.S.C. § 78u–4(b)(1)." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 996 (9th Cir.1999). "In other words, the lenient inferences in plaintiff's favor that are normally *de rigeur* in considering a motion to dismiss cannot paper over key factual deficiencies in a securities-fraud complaint." *In re Northpoint Communications Group, Inc., Sec. Litig.,* 221 F.Supp.2d 1090, 1094 (N.D.Cal.2002). In order to meet the pleading requirements of the PSLRA, a party must " 'plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.' " *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388–89 (9th Cir.2002) (quoting *Silicon Graphics,* 183 F.3d at 974).

### B. *Analysis*

#### 1. *The Plaintiff's Section 10(b) Claims*

##### a. *The Confidential Sources*

The defendants argue that the plaintiff fails to satisfy the heightened pleading requirements of Section 10(b) as governed by the PSLRA, because the plaintiff's allegations regarding confidential sources are insufficient. (Mot. at 9.) The defendants note that the plaintiff relies principally on the accounts of three confidential sources to support its claims. (Opp. at 16 (citing Am. Consol. Compl. ¶¶ 4, 6, 25, 61, 63–64, 80, 82, 112, 141, 147, 177, 181).)

The first confidential source relied on by the plaintiff ("CS1") was an account/engagement manager at SeeBeyond in 2001, shortly before the Class Period. (Am.Consol.Compl.¶ 4.) CS1 supports the plaintiff's allegation that SeeBeyond senior management attempted to compensate for a decline in business by improperly "pulling" revenue from future quarters in order to meet financial estimates. (*Id.*) CS1 also supports the plaintiff's allegation that E & Y frequently challenged the numbers provided by the defendants during analyst conference calls, and that it was common knowledge among SeeBeyond employees that, after such conference calls, E & Y would meet with defendant Demetriades in his office and admonish him for providing inaccurate numbers. (*Id.*) CS1 also supports the plaintiff's allegation that when SeeBeyond was in danger of not reaching its quarterly revenue estimates, company management would inflate financial results by recognizing revenue on contracts that had not yet been signed. (*Id.* ¶ 61.) Finally, CS1 supports the plaintiff's allegation that SeeBeyond rushed to sell software that it knew was not ready for release in order to generate quarterly revenue. (*Id.* ¶ 67.)

The second confidential source relied on by the plaintiff ("CS2") was an employee at SeeBeyond during the Class Period. (*Id.* ¶ 6.) CS2 supports the plaintiff's allegations (1) that it was common practice prior to and during the Class Period for SeeBeyond's senior management to prematurely and improperly recognize reve-

nue, as exemplified by the attempt of See-Beyond's management to recognize all revenue on the GM contract during the first quarter; (2) that defendants Demetriades and Plaga were responsible for the attempt to improperly recognize revenue during the first quarter of 2002 and were only prevented from doing so by E & Y; (3) that defendant Demetriades' references to the "transparency" and "visibility" of SeeBeyond's financial results were merely attempts to convince the market that the defendants were not hiding anything, but that this impression was false because defendant Demetriades knew or recklessly disregarded that SeeBeyond management did whatever it wanted, even when its actions conflicted with the company's own policies; and (4) that SeeBeyond knew that it was experiencing product defects during the Class Period but made no effort to correct the defects. (*Id.* ¶¶ 6, 25, 68.)

The third confidential source relied on by the plaintiff ("CS3") is allegedly an individual with contemporaneous knowledge during the Class Period. (*Id.* ¶ 80.) CS3 supports the plaintiff's allegation that the management of SeeBeyond's UK subsidiary prematurely booked $2 million in revenue for the contract with Syngenta, in violation of both GAAP and the company's revenue recognition policy. (*Id.* ¶ 80.)

The defendants argue that although the plaintiff is not required to allege the names of confidential sources, the plaintiff must at least provide the titles, dates of employment, duties, and allege how the sources learned the alleged information. (Mot. at 10.) The defendants contend that the plaintiff's confidential source allegations fall short of these requirements, because only one of them is identified by title: the former "Account/Engagement Manager." (*Id.* (citing Am. Consol. Compl. ¶¶ 4, 61–62).) The defendants note that the other confidential sources are identified only as "former employee[s]." (*Id.* (citing Am. Consol. Compl. ¶¶ 6, 25, 63, 68).) The defendants argue that the plaintiff provides no identifying facts, such as the dates of employment, the area the employees worked in, to whom they reported, what their jobs entailed, or why they would have knowledge of SeeBeyond's revenue recognition practices. (*Id.* at 11.) The defendants also argue that the plaintiff alleges no facts demonstrating that these witnesses' accounts are reliable, and no detail upon which a basis for their accounts could be discerned. (*Id.*)

The plaintiff responds by arguing that allegations concerning the confidential sources are corroborated and reliable. (Opp. at 15.) Significantly, the plaintiff has submitted a declaration providing additional information on CS1, CS2, and CS3, which could be incorporated in an amended complaint. Specifically, the plaintiff is prepared to plead that CS1 "was an Account/Engagement Manager, Professional Services, at SeeBeyond . . . in 2001. CS 1 was responsible for service delivery and resource issues and managed the overall relationships with assigned clients. CS 1 was required to build new revenue into existing accounts and more profitably manage those accounts." (Karam Decl. ¶ 1.) The plaintiff is prepared to plead that CS2 "was a Program Manager at SeeBeyond during the Class Period. CS 2 was responsible for following specific products from conception through implementation and finally through Quality Assurance." (*Id.* ¶ 2.) Finally, the plaintiff is prepared to plead that CS3

is a former executive with SeeBeyond UK who headed up the Company's major accounts in Europe. CS 3 left See-Beyond UK in the summer of 2002, after being employed there for approximately two and a half years, and received information about Syngenta attributed to him

the Complaint directly from personal contacts at Syngenta.

(*Id.* ¶ 3.) [3]

The defendants argue that the plaintiff's confidential witnesses' allegations still do not satisfy the "all facts" requirement of the PSLRA. (Reply at 3.) The defendants point out that CS1 was allegedly employed before the Class Period, and that CS1's allegation that senior management improperly pulled revenue from future quarters in order to meet financial estimates fails to specify which revenue was allegedly pulled, what the impact of this pulling had on SeeBeyond's reported numbers, and who among senior management was involved. (*Id.* at 3–4.) Thus, argue the defendants, the plaintiff still does not provide any corroborating details as required by *Silicon Graphics.* Furthermore, the defendants contend that CS1's employment in SeeBeyond's "professional services" department demonstrates that CS1 was not employed in any accounting or finance capacity, and thus would not have been in a position to evaluate the company's financial statements or its interactions with its auditors. (*Id.* at 4.) Thus, the defendants argue, the plaintiff offers no indication that CS1's knowledge concerning these matters would be reliable. (*Id.* at 5.)

The defendants also argue that CS2's allegations regarding the GM contract should be rejected, because the event allegedly occurred before the Class Period, and because, based on the plaintiff's description of CS2's job duties, CS2 was apparently employed in SeeBeyond's engineering department. (*Id.*) Thus, argue the defendants, CS2 would have no basis to conclude that a deferral or allocation of

revenue was improper, and would not have access to information concerning the GM revenue, or SeeBeyond's communications with E & Y on this point. (*Id.* at 5–6.)

Finally, the defendants argue that CS3's allegations regarding the Syngenta contract should be rejected, because the plaintiff does not provide CS3's job title, and because CS3's allegation is based on hearsay. (*Id.* at 6.) The defendants point out that the plaintiff does not identify CS3's personal contacts at Syngenta, what the contacts said, or how they concluded that an unidentified "condition" precluded See-Beyond from recognizing revenue in the fourth quarter of 2001. (*Id.*)

■ The Second Circuit has held that: [T]he PSLRA rejects any notion that confidential sources must be named as a general matter. In our view, notwithstanding the use of the word "all," paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the

---

3. The plaintiff contends, however, the allegations of the confidential sources are not necessary for the plaintiff to make sufficient allegations of falsehood, materiality, and scienter as to the April 1 revenue pre-announcement

and the April 22 conference call, because the admissions of defendants Demetriades and Plaga provide evidence of reliability. (Opp. at 16 (citing *Silicon Graphics,* 183 F.3d at 985).)

source would possess the information alleged.

*Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir.2000) (emphasis in original; footnote omitted). This reasoning has been adopted in this district and found to be consistent with Ninth Circuit case law.

There appears to be little support for the proposition that plaintiffs must always disclose the names of human sources in order to satisfy the PSLRA's pleading requirements. The language of the PSLRA does not expressly prohibit pleadings based on anonymous sources, and such a prohibition cannot reasonably be implied from the legislative history. Moreover, *Silicon Graphics* does not require plaintiffs to disclose the names of all their sources. Rather, it requires plaintiffs to plead "corroborating details" when allegations are based on non-public information. *See In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d at 985. "It is possible to identify sources and provide other corroborating details without disclosing the names of [the] sources." *In re McKesson HBOC, Inc., Secs. Litig.*, 126 F.Supp.2d 1248, 1271 (N.D. Cal.2000).

*In re Lockheed Martin Corp. Sec. Litig.*, 2002 WL 32081398, at *8 (C.D.Cal.) (footnote omitted). The court in *Lockheed Martin* explicitly adopted the standard in *Novak* and held:

A plaintiff may use an anonymous source to support allegations in a complaint governed by the PSLRA provided the source is described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. *See Novak*, 216 F.3d at 314.... The standard articulated above applies only when the plaintiff has already received the information from the referenced source. The plaintiff must describe a specific person, not just the job title of someone likely to have the desired information.

2002 WL 32081398, at *8; *see also In re Northpoint*, 221 F.Supp.2d at 1097 ("Reliance on confidential witnesses is not *per se* improper under the PSLRA, notwithstanding its requirement that a plaintiff plead 'all facts' when making allegations based on information and belief. [Citation.] To contribute meaningfully toward a 'strong inference' of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge. [Citation.]"). In the context of this analysis, the Second Circuit has pointed out that the "all facts" requirement of the PSLRA cannot mean what it says. "Paragraph (b)(1) is strangely drafted. Reading 'all' literally would produce illogical results that Congress cannot have intended." *Novak*, 216 F.3d at 314 n. 1.

The Court finds that, with the proposed amendments, the plaintiff's complaint is sufficient in this regard. The plaintiff has provided significant details regarding the confidential sources' involvement with SeeBeyond. The confidential sources each appear to have held a significant position at the company, and the information attributed to each does not appear unreliable or clearly beyond the type of knowledge that each source might have. Moreover, additional information, such as the exact dates of employment, would significantly erode the confidentiality of these sources. Specific concerns relating to the chronology of events and whether the sources had contemporaneous information are addressed further below. Therefore, the Court finds that the allegations regarding the confidential sources, amended as proposed, are sufficient under the PSLRA.

#### b. *The Plaintiff's Allegations Regarding Its Accounting Claim*

■ As noted above, the plaintiff challenges statements relating to SeeBeyond's Q4'01 and 2001 financial statements because of the alleged premature recognition of revenue from the Syngenta contract. The defendants contend that this claim must fail because the plaintiff has failed to allege what "conditions" Syngenta allegedly imposed that made the revenue properly recognized in January, not December. (Mot. at 12.) "Plaintiff fails to allege the one 'fact' that would demonstrate SeeBeyond's recognition of Syngenta revenue was improper, i.e., the 'condition' which purportedly precluded revenue recognition until Q1'02." (Reply at 7 (footnote omitted).)

The complaint reads, in relevant part, "Senior management at the Company was notified on December 14, 2001, however, that Syngenta had imposed a condition to the contract that precluded recognition of any revenue on that contract until January 14, 2002, when the condition would no longer be in place." (Am.Consol.Compl.¶ 80.)

This situation is similar to that in *In re Secure Computing Corp. Securities Litigation,* 120 F.Supp.2d 810, 819 (N.D.Cal. 2000), where the plaintiffs alleged that the defendants had improperly recognized revenue on a government contract, thereby overstating the company's revenue. There, the court pointed out that, while the plaintiffs had made a number of precise allegations regarding the contract and the recognized revenue, the plaintiffs "ha[d] not alleged facts that adequately explain why Secure was not entitled to recognize revenue on the DMS contract during the fourth quarter of 1998." *Id.* at 820. There, the court required the plaintiffs, in an amended complaint, to "clarify the precise reasons why Secure was not entitled to recognize revenue on the ... contract during the fourth quarter of

1998." *Id.* This holding in *Secure Computing* is persuasive in this case.

Moreover, presumably the plaintiff is aware of the nature of the condition that Syngenta placed upon the contract, as it appears necessary to the plaintiff's conclusion that SeeBeyond recognized revenue prematurely. The defendants point out certain examples of "conditions" that may have been imposed that would not have required deferring recognition of revenue. (Reply at 7 n. 1.) Therefore, the Court finds that the plaintiff must amend its complaint and allege the details of the condition placed upon the Syngenta contract that made SeeBeyond's recognition of revenue in Q4'01 improper.

#### c. *Plaintiff's Claims Regarding Product Defects and the Effects of Competition*

The defendants also argue that the plaintiff's claims based on the allegedly false or misleading statements regarding customer dissatisfaction and adverse effects of competition must fail.

#### i. *Claims Regarding Product Defects*

■ With respect to product defects, the defendants claim that the "Plaintiff ... fails to allege any specifics regarding these alleged defects, such as when they were discovered, how significant they were, or how (or even if) they impacted SeeBeyond's revenues." (Mot. at 13.) The defendants argue that the plaintiff's "failure to tie the purported defective products to the shortfall in Q1'02" is fatal to [the plaintiff's] claims." (*Id.*)

The plaintiff claims that its allegations in this regard are sufficiently particular, as the complaint alleges

SeeBeyond sold defective software that management knew was not ready to be released. For example, despite the fact that the Company's E–Insight, Version

5.1 contained a number of defects that prevented it from running properly, it was shipped to customers.... Alex Demetriades, Senior Vice President of Products and brother of Defendant James T. Demetriades, was specifically aware that E–Insight 5.1 did not work, but, nonetheless, directed that the product be shipped to customers. As a result of these product defects, customers frequently refused to pay for their purchases, causing the Company's accounts receivable to grow.

(Am. Consol. Compl. ¶ 5; *see also id.* ¶¶ 67–68.) The complaint further alleges that "the $9 million increase in the Company's accounts receivable during the first quarter of 2002 was caused by the undisclosed increase in the number of customers that refused to pay for the defective products shipped by the Company." (*Id.* ¶ 177; *see also id.* ¶ 126 ("As a consequence [of the defective products], Seebeyond customers were not only refusing to pay for products purchased from the Company, but were doing business with its competitors.").)

**4.** The defendants also claim that there was no Version 5.1 during the Class Period, and that SeeBeyond was "only up to Version 4.2 ...." (Reply at 12 n. 5.) If this is the case and, as implied, Version 5.1 was actually produced *after* the Class Period, then it cannot have been the case that the shipping of defective Version 5.1 products caused the increase in the accounts receivable during the Class Period.

Though the prospectus that supports this claim was not attached to the complaint, it may be considered in conjunction with this motion. "[A] district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998) (footnote omitted). "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."

While the Court finds that the allegations of defective products are otherwise sufficient, the defendants raise a legitimate question as to the timing of the defects. (*See* Reply at 12.) It appears as though allegations regarding the shipping of Version 5.1 are supported by CS1. (*See id.;* Am. Consol. Compl. ¶ 5.) CS1 is not alleged to have been employed during the Class Period. It is possible that CS1 had knowledge of the shipment of defective products prior to the Class Period that had an effect on accounts receivable during the Class Period.[4] However, the Court finds that the plaintiff must provide additional information regarding the dates during which allegedly defective products were produced and shipped. Such clarification will strengthen the alleged connection between the claimed defects and the increase in accounts receivable.

ii. *Claim Regarding the Effects of Competition*

■ The defendants also claim that the complaint similarly fails with respect to

*Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002). The prospectus, from February 2002, is apparently referred to in the Amended Consolidated Complaint and integral to the plaintiff's claims. (*See, e.g.* Am. Consol. Compl. ¶ 121.) The plaintiff does not question the authenticity of the document.

However, the prospectus does not clearly support the defendants' argument in this regard. First, the only software version mentioned in the pages cited by the defendants is 4.5, not 4.2. (Dohadwala Decl., Ex. 3 at 92.) Moreover, the statement reads, in relevant part: "[I]n June 2001 we released the 4.5 version of e*Gate software." (*Id.*) e*Gate appears to be one component of SeeBeyond's Business Integration Suite, of which e*Insight is another. (*See id.* at 91–92.) While it appears as though e*Insight is somehow built on e*Gate (*see id.* at 92), it is not clear from the prospectus that the reference to version 4.5 was meant to apply to e*Insight.

the alleged failure to disclose the impact of increased competition. The plaintiff "do[es] not provide any detail as to the nature of this alleged increase in competition or tie it to any adverse effect on SeeBeyond's revenues." (Mot. at 13.) The defendants also claim that fierce competition in SeeBeyond's integration business was publicly known. (*Id.* at 14.) Therefore, the defendants argue, the fact that SeeBeyond was facing increasing competitive pressure cannot support a claim for fraud. (*Id.*)

The plaintiff responds by arguing,

Although the market may have known about the competitive nature of the industry in general, it clearly did *not* know that SeeBeyond, by marketing defective products, was placing itself at a competitive disadvantage, and was recognizing revenue that it knew or recklessly disregarded would be uncollectable.

(Opp. at 20 (emphasis in original).) A review of the complaint reveals that the claims relating to competition are intertwined with the allegations regarding defective products. The relevant paragraph reads:

Furthermore, Demetriades knew, or recklessly disregarded, but failed to disclose that the Company's first quarter 2002 financial results were adversely impacted by increased competition, as well as customer dissatisfaction with SeeBeyond's defective products. As alleged above, ... the Company rushed products, such as its E–Insight version 5.1, to market in order to generate revenues, despite the fact that such software contained defects that prevented it from working properly. As a consequence, Seebeyond customers were not only refusing to pay for products purchased

from the Company, but were doing business with its competitors.

(Am.Consol.Compl.¶ 126.) The defendants do not address this issue in their reply brief. The Court finds that the allegations regarding increased competition are sufficient in that they relate, with requisite specificity, the impact of the defective products on SeeBeyond's well-being.[5]

d. *The April 1, 2002 Press Release and the Statutory Safe Harbor*

■ The safe harbor provision of the PSLRA provides that, in the context of a private action, a defendant shall not be liable with respect to any forward-looking statement if:

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1) (footnote omitted); *see also No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America*

---

5. As the defendants concede, in fact argue strenuously (*see* Mot. at 13–14), that the competitive nature of the industry was well known, the plaintiff need not provide additional allegations regarding the basic fact of competition in the industry.

*W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir.2003). Under the safe harbor provision, a "forward-looking statement" includes, among other things, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; ... [or] a statement of future economic performance ...." 15 U.S.C. § 78u–5(i)(1).

The defendants argue that the statements in the April 1, 2002 press release are protected by the statutory safe harbor as forward-looking statements. (Mot. at 14.) The defendants contend that the "preliminary" financial results in this press release were "estimates or projections" of SeeBeyond's future economic performance. (*Id.*) The press release also contained certain cautionary language regarding the fact that the results were subject to risks and "accounting adjustments" during the quarter's close. (*Id.* at 14–15.)

The plaintiff contends that because the results were a statement regarding the quarter that had just ended, the announcement was about an historical fact rather than a "projection" or a "statement of future economic performance" under 15 U.S.C. § 78u–5(i). Indeed, the first quarter, about which the statement was made, ended the day prior to the April 1, 2002 press release.

However, while the period about which the statement was made was complete, the Court finds that the statement was a forecast and recognized as such in the press release. The statement was "preliminary" and stated certain results that SeeBeyond "expect[ed]" to report. (*See* Dohadwala Decl., Ex. 4 at 133.) The mere fact that the quarter had ended does not necessarily render the statement less than a forecast, especially considering the fact that the statement was made only one day after the quarter ended. Therefore, the Court finds

that the relevant statement in the April 1, 2002 press release was a forward-looking statement within the meaning of the safe harbor provision.

■ The more difficult issue presented by this motion is whether the statement nevertheless fails to fall within the statutory safe harbor. The plaintiff contends that, even if the statement was a forecast, either it was not accompanied by meaningful cautionary language or it was made with actual knowledge that it was false or misleading. (Opp. at 12–15.) In this respect the parties dispute the meaning of the statutory provision. One argument put forth by the plaintiff implies that, under the safe harbor provision, even if a statement is forward-looking and accompanied by meaningful cautionary language, a plaintiff may survive a motion to dismiss if the relevant statement was made with actual knowledge. (*See id.* at 12, 15.)

Indeed, recent Ninth Circuit case law appears to support this conclusion. In *America West,* the Ninth Circuit made the following statements:

> The [safe harbor] provisions provide that a person shall not be liable for any "forward-looking statement" that is "identified" as such, and is accompanied "by meaningful cautionary statements["] .... However, a person may be held liable if the "forward-looking statement" is made with "actual knowledge ... that the statement was false or misleading."

320 F.3d at 936 (citation & footnote omitted). In a footnote that follows soon in the discussion, the Ninth Circuit reiterated this: "it is arguable that a strong inference of actual knowledge has been raised, thus, excepting these statements from the safe harbor rule altogether." *Id.* at 937 n. 15. These statements of law indicate that, if a plaintiff sufficiently alleges that the defendant had actual knowledge, the presence of cautionary language will not insulate a de-

fendant from liability for particular forward-looking statements.

However, the statement of the law in *America West* does not appear to be consistent with the statute. The statute, legislative history and courts interpreting the statute indicate that if a defendant shows that a forward-looking statement is accompanied by meaningful cautionary language, a court need not turn to subsection (B) and examine whether the plaintiff, nevertheless, has sufficiently alleged actual knowledge. In other words, these two prongs of the safe harbor provision are taken to be independent, alternative means by which a defendant may insulate itself from liability; the first prong, which comes into play when meaningful cautionary language is present, does not require looking at the defendant's state of mind, while the second prong provides additional protection for a defendant where sufficient cautionary language is absent.[6] Such an interpretation of the statute is consistent with the use of the disjunctive "or" between subsections (A) and (B) of 15 U.S.C. § 78u–5(c)(1). *See* 15 U.S.C. § 78u–5(c)(1); H.R. Conf. Rep. No. 104–369 (1995), U.S. Code Cong. & Admin. News at 730 ("It is a bifurcated safe harbor that permits greater flexibility to those who may avail themselves of safe harbor protection.... The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement.... The second prong of the safe harbor provides an alternative analysis."); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999) ("In that safe harbor, corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements[']....
Even if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.' " (citations omitted)); *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1068 n. 4 (N.D.Cal.2001) ("[s]ubsections (A) and (B) of 15 U.S.C. § 78u–5(c)(1) provide alternative means by which forward-looking statements may qualify for the safe harbor.... This conclusion is required by the plain language of the statute .... Moreover, the legislative history confirms [this reading]." (internal quotations & citations omitted)); *but see Schaffer v. Evolving Sys., Inc.*, 29 F.Supp.2d 1213, 1224 (D.Colo.1998) ("The Court finds that Defendants' ... press release is a forward-looking statement .... In addition, the statement is accompanied by sufficiently specific cautionary language. Nevertheless, the Court finds that the ... press release does not fall within the PSLRA's safe harbor provision. Plaintiffs correctly argue that the safe harbor provision provides no refuge for Defendants who make statements with 'actual knowledge' of their falsity."); Anthony D. Weis, "Striking an Imbalance: The Interpretation of Section 21D(B)(2) of the Securities Exchange Act of 1934 in Silicon Graphics," 59 Ohio St. L.J. 1741, 1766 (1998) ("a person may no longer be held liable in a private securities action for any forward-looking statement that is accompanied by certain cautionary language, unless the statement is proved to have been made with actual knowledge that it was false or misleading." (footnote omitted)). On this understanding of the statute, once a defendant has met the requirements of subsection (A), the court need not—indeed should not—inquire into whether the defendant meets the requirements of subsection (B).

It is important to note that this Court is not bound by *America West* in this regard

---

**6.** Technically, the safe harbor has three "prongs," as statements that are simply "immaterial" also fall within its purview. 15 U.S.C. § 78u–5(c)(1)(A)(ii).

because the relevant statements are dicta. *See* 320 F.3d at 936 (deciding that the statements at issue were not forward-looking and were not accompanied by the requisite meaningful cautionary language). While the *America West* court indicated that the allegations may have also raised a strong inference of actual knowledge, the court did not rule on this ground. Therefore, this Court finds that, under the language of 15 U.S.C. § 78u–5, a defendant is insulated from liability if it satisfies either subsection (A) or subsection (B); either prong is sufficient for immunity.

Commentators have speculated that this statutory scheme grants defendants in securities cases a "license to lie." *See* Steven J. spencer, Note, "Has Congress Learned Its Lesson? A Plain Meaning Analysis of the Private Securities Litigation Reform Act of 1995," 71 St. John's L.Rev. 99, 121–22 (Winter 1997). In other words, this interpretation of the statute seems to imply that, if a defendant simply uses cautionary language, *any* statement can be made with impunity, even if the defendant has full knowledge that the statement is false or misleading.[7] *See* William H. Kuehnle, "On Scienter, Knowledge, and Recklessness Under the Federal Securities Laws," 34 Hous. L.Rev. 121, 132 (Spring 1997) ("Conversely, if cautionary language is used, there is no liability even if the forward-looking statement is made with actual knowledge of its falsity. This remarkable provision appears to be the only provision of the federal securities laws that actually permits making false statements knowingly to investors." (footnote omitted)). This conclusion has clear negative (arguably absurd) results. *See, e.g.,* Spencer, *supra* 71 St. John's L.Rev. at 122 ("This does little to encourage public investment in a company, for any statement accompanied by statutorily sufficient cautionary language might be a blatant lie, and yet remain protected by the safe harbor." (footnote omitted)).

The Court does not agree with the commentators' conclusions. Instead, subsection (A)'s requirement that *meaningful* cautionary language accompany the forward-looking statement severely limits the possibility that false or misleading statements could be made with actual knowledge and yet be protected under the safe harbor provision. If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading. These are undeniably "important factors that could cause actual results to differ materially from those in the forward-looking statement ...." 15 U.S.C. § 78u–5(c)(1)(A)(i).[8] Only if such information is

---

7. Apart from reasons set forth below that indicate that such a conclusion is not warranted under 15 U.S.C. § 78u–5, it should be noted that the safe harbor in 15 U.S.C. § 78u–5 only applies to private actions, not actions by the SEC. *See* 15 U.S.C. § 78u–5(c)(1) (limiting the relevant safe harbor provision to "any private action arising under this chapter ..."); *SEC v. U.N. Dollars Corp.,* 2003 WL 192181, at *2 (S.D.N.Y.) ("the limitation of liability for forward-looking statements applies only in private actions, not enforcement actions brought by the SEC.").

8. It may be argued that this reading of 15 U.S.C. § 78u–5(c) improperly imports a state of mind element into subsection (A). Both Congress and courts have focused on the fact that, unlike subsection (B), subsection (A) does not require an investigation into the speaker's state of mind. *See* H.R. Conf. Rep. No. 104–369 (1995), U.S. Code Cong. & Admin. News at 743–46 ("The use of the words 'meaningful' and 'important factors' are intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind

included can the cautionary language be "meaningful." This result is consistent with the purpose of the statutory safe harbor. Congress intended "the statutory safe harbor protection to make more information about a company's future plans available to investors and the public." *See* H.R. Conf. Rep. No. 104–369 (1995), U.S. Code Cong. & Admin. News at 744. Congress could not have intended to foster the dissemination of information that is known to be false or misleading.

■ The April 1 press release reads, in part:

> Certain statements in this press release, including those related to estimated revenue and earnings per share for the first quarter of fiscal 2002, ... constitute for-

of the defendant.... The applicability of the safe harbor provisions under subsections (c)(1)(A)(I) and (c)(2) shall be based upon the sufficiency of the cautionary language under those provisions and does not depend on the state of mind of the defendant."); *Splash*, 160 F.Supp.2d at 1069.

However, something like a "state of mind" element of subsection (A) is already clearly present in the statute. Whether cautionary language is meaningful, in that it identifies important factors, can only be understood with reference to the defendant's knowledge of relevant factors. This result follows from the fact that courts and Congress have made clear that mere boilerplate cautionary language will not do. *See In re Clorox Co. Sec. Litig.*, 238 F.Supp.2d 1139, 1142 (N.D.Cal. 2002) ("The cautionary statements must, within context, be meaningful; boilerplate, generalized warnings do not suffice to balance specific predictions."); H.R. Conf. Rep. No. 104–369 (1995), U.S. Code Cong. & Admin. News at 742 ("Under this first prong of the safe harbor, boilerplate warnings will not suffice as meaningful cautionary statements ...."); *see also Harris*, 182 F.3d at 807. Something beyond a list of "the usual suspects" of risk factors must be provided. Moreover, whether a specific factor is "important" and therefore should be listed, likely should not be evaluated by an objective standard (i.e. what the defendant should have known). If an objective standard is adopted for determining whether a factor is "important," then it seems this would *heighten* the bar of the first prong of the safe harbor provision, making it more difficult for defendants to take advantage of its grant of immunity. This result seems contrary to congressional intent. Instead, it appears as though a determination of whether "important" factors have been identified should be made with reference to those factors of which the speaker is aware—things that the speaker believes may cause actual results to vary. Therefore, it appears as though the cautionary statement cannot be evaluated without reference to the defendant's knowledge.

While it is undisputed that a speaker need not identify all of the factors that may cause actual results to differ from a prediction, a speaker with actual knowledge that a prediction is false or misleading must identify the basis for the misleading or false nature of the prediction, as surely this is an important factor that could—perhaps undoubtedly will—make actual results differ materially from those in the forward-looking statement.

It may also be argued that this reading of 15 U.S.C. § 78u–5(c)(1) obliterates the distinction between subsections (A) and (B), as the key element under both prongs seems to simply be whether the plaintiff alleges that the defendant had actual knowledge. The Court disagrees. Subsection (B) sets the standard the plaintiff must meet when no cautionary language is present. Subsection (A) may still provide safe harbor where cautionary language is used, even if the defendant has actual knowledge that the statement is false or misleading. The idea that sufficient cautionary language may be used when the defendant has actual knowledge that a statement is somehow misleading (for instance, where the company is engaging in "puffery" of some sort) is not so far-fetched. On a related note, the two-prong construction of the safe harbor provision may be explained by the fact that Congress was perhaps looking to the existing "bespeaks caution" doctrine when enacting subsection (A), while seeking to place a heightened burden on plaintiffs when enacting subsection (B). *See* Ann Morales Olazábal, "Safe Harbor for Forward–Looking Statements Under the Private Securities Litigation Reform Act of 1995: What's Safe and What's Not?" 105 Dick. L.Rev. 1, 13 (Fall 2000); Spencer, *supra* at 123.

ward-looking statements .... Actual results in future periods are subject to risks and uncertainties which could cause actual results to differ materially from those projected.

(*See* Dohadwala Decl., Ex. 4 at 134.)[9] The press release identifies certain specific risks that may cause the preliminary results to differ from the final results. (*Id.* ("Such risks include the level of demand for our products and services from new and existing customers, the timing and amount of information technology-related spending, the general state of the economy, risks arising from accounting adjustments, unpredictable and lengthy sales cycles, dependence on revenues from a single software suite, [etc.].").)

Here, the plaintiff has made sufficient allegations that the defendants had actual knowledge that the statements in the April 1 press release were false or misleading. While the defendants argue that the plaintiff's allegations are insufficient to establish knowledge that the statement was false or misleading (*see* Reply at 16–19), the Court does not agree that the "Plaintiff's Own Allegations Belie Its Assertion That Defendants 'Actually Knew' The Estimated Range Was False" (*see id.* at 16). Moreover, the cautionary language in the press release does not sufficiently identify those factors that the plaintiff alleges made the press release false or misleading. Therefore, the cautionary language in the press release is not "meaningful" cautionary language entitling the defendants to

safe harbor protection under 15 U.S.C. § 78u–5(c)(1)(A). The Court finds that the April 1 press release does not fall within the safe harbor provision under 15 U.S.C. § 78u–5(c)(1)(A) or (B).

### e. *Whether the Plaintiff Pleads Particularized Facts Giving Rise to a Strong Inference of Scienter*

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). In the Ninth Circuit, the required state of mind is one of " 'deliberate or conscious recklessness'." *America West*, 320 F.3d at 931 (quoting *Silicon Graphics*, 183 F.3d at 979). The defendants argue that the plaintiff fails to plead particularized facts giving rise to a strong inference of scienter as required.

### i. *The Syngenta Contract*

In reference to the Syngenta contract, the defendants argue that none of the plaintiff's four relevant allegations demonstrates that the defendants knew, or recklessly disregarded, that the Syngenta revenue was improperly recognized. (Reply at 19.)

First, the plaintiff alleges that according to CS3, SeeBeyond senior management was notified on December 14, 2001 that a "condition" had been imposed on the Syngenta contract precluding recognition of

9. The plaintiff contends that a determination of whether cautionary language is sufficiently meaningful is a question of fact that should not be determined on a motion to dismiss. (Opp. at 13.) The Court disagrees and finds that, under the PSLRA, such a determination may be made as a matter of law. *See* 15 U.S.C. § 78u–5(e) ("On any motion to dismiss based upon [the safe harbor provision], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute ...."); *Harris*, 182 F.3d at 807 (appeal of a motion to dismiss: "The district court was correct that adequate cautionary language accompanies the forward-looking statements here."); *see also America West*, 320 F.3d at 937 (appeal of a motion to dismiss: "even if we were to find [the statements] to be 'forward-looking,' neither statement is accompanied by the requisite 'meaningful cautionary statement.' ").

any revenue on the contract until January 14, 2002. (Opp. at 22; Am. Consol. Compl. ¶ 80.) The defendants argue that this allegation is insufficient to give rise to a strong inference of scienter because the plaintiff fails to identify which members of "senior management" were notified, by whom, or of what. (Reply at 19.)

Second, the plaintiff alleges that the defendants' knowledge of SeeBeyond's revenue-recognition policy—namely, that recognition is only permitted when "no other significant obligations remain"—supports an inference that SeeBeyond senior management either knew or consciously disregarded that recording the $2 million from the Syngenta contract would violate company policy. (Opp. at 22; Am. Consol. Compl. ¶¶ 114–15.) The defendants argue that this allegation does not support an inference of scienter because the plaintiff fails to recognize any "other significant obligations" remaining on the Syngenta contract that would have made recognition of revenue improper. (Reply at 20.)

Third, the plaintiff alleges that the recognition of the Syngenta revenue was material because it turned into income what would have been a loss; i.e., if SeeBeyond had not recognized the revenue, it would have reported a loss for the fourth quarter of 2001. (Opp. at 22 (citing SEC Staff Accounting Bulletin 99); Am. Consol. Compl. ¶ 81.) The defendants argue in response that this allegation is not probative of scienter. The defendants argue that "[t]he same could be said about any revenue whether it was properly recognized or not." (Reply at 20.)

Fourth, the plaintiff contends that the accounts of CS1 and CS2 support an allegation that SeeBeyond had a practice of prematurely recognizing revenue "until caught and prevented from doing so by the Company's auditors." (Opp. at 22; Am. Consol. Compl. ¶¶ 4, 6, 25, 61, 63–4, 82, 112, 141, 147, 177, 181.) The defendants

respond that the positions held by CS1 and CS2 (account/engagement manager, professional services, and program manager, respectively) were too far removed from accounting and finance to give their accounts any weight. (Reply at 20.) Moreover, the defendants argue, the plaintiff's allegations negate an inference of scienter because E & Y certified the financial statements containing the Syngenta revenue. (*Id.*)

### ii. *Defendants' Stock Sales*

The plaintiff alleges that defendant Demetriades' sale of two million shares of SeeBeyond stock for more than $18 million during the Class Period was unusual and suspicious. (Opp. at 23–24; Am. Consol. Compl. ¶ 183.) The plaintiff argues that the sale was timed to coincide with See-Beyond's announcement of its first profit in the fourth quarter of 2001, giving defendant Demetriades a motive to misrepresent the company's financial results from that quarter in order to raise the stock price. (Opp. at 23; Am. Consol. Compl. ¶ 182.) The plaintiff also notes that defendant Demetriades has not sold any of his SeeBeyond stock since February 2002; that defendant Demetriades' Class–Period sale was atypical of his prior sales; and that the Class–Period sale was in close proximity to false positive statements, since the sale was made on February 26, 2002, and the February 21, 2002 Registration and Prospectus incorporated allegedly false and misleading financial results reported in SeeBeyond's 2001 10–K form. (Opp. at 23–24; Am. Consol. Compl. ¶ 183; Opp. at 24–25; Am. Consol. Compl. ¶¶ 113, 120.) Finally, the plaintiff notes that the failure of some insiders to sell stock does not negate an inference of scienter. (Opp. at 24.)

The defendants argue that the plaintiff fails to allege facts showing that defendant Demetriades' stock sale was unusual or

suspicious, and that the plaintiff's allegations of insider stock sales do not raise a strong inference of scienter. (Mot. at 19; Reply at 21.) The defendants argue that defendant Demetriades was the only defendant to sell stock during the Class Period. (Reply at 21.) The defendants further argue that Demetriades sold only 7.6% of his personal holdings in SeeBeyond stock—too small a percentage to give rise to the required strong inference of scienter, and also an amount not "dramatically out of line with his prior trading practices." (Mot. at 20.) According to the defendants, no scienter can be inferred from the sale because none of the defendants other than Demetriades is alleged to have sold any stock during the Class Period. (Reply at 21.) Indeed, the defendants argue that defendant Lane's purchases of stock negate an inference of scienter because they are inconsistent with a motive to maximize his personal benefit from an artificial inflation of the stock price. (*Id.* at 22.)

In response to the plaintiff's claim that defendant Demetriades' Class–Period stock sale was atypical of his previous sales, the defendants contend that the plaintiff incorrectly disregards defendant Demetriades' prior stock sales to defendant Lane. (Reply at 21 (citing Am. Consol. Compl. ¶ 183).)

The Court finds that, taking the allegations together, the plaintiff has presented sufficient allegations to raise the strong inference of scienter. *America West*, 320 F.3d at 938 ("Beyond each individual allegation, we also consider whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." (internal quotations & citation omitted)). The plaintiff claims that the defendants engaged in a deliberate pattern of improper behavior, and the Court, as noted above, declines to find that the confidential sources of this information are necessarily unreliable. While Demetriades may not have sold a large percentage of his shares, as emphasized by the defendants, the amount of income he generated through his sales, $18 million, is significant.[10] Moreover, the plaintiff alleges that defendants Demetriades and Plaga admittedly lied to analysts and investors on April 22, 2002. (*See* Opp. at 21; Am. Consol. Compl. ¶¶ 140–41, 154.) The evidence in the complaint in this regard at least raises a strong inference that these individuals deliberately misled analysts and investors; Demetriades and Plaga made deferral of certain revenue appear voluntary when later press reports confirmed that SeeBeyond was directed to defer such revenue by E & Y. (*See* Am. Consol. Compl. ¶ 154 (quoting a *Wall Street Journal* article: " 'You don't really say, 'Our auditors made us do it' on a conference call,' Mr. Plaga says.").)[11] The Court finds that these allegations, taken together with the others noted above, are sufficient to raise a strong inference that the defendants acted with deliberate or conscious recklessness.

f. *"Analyst Entanglement" and Statements by Third Parties*

■ The defendants also argue that many of the statements at issue here were

10. Using figures alleged in the complaint, all six of Demetriades' prior sales totaled approximately $13.3 million.

11. The defendants do not reply to this argument specifically in the portion of their reply brief that deals with scienter. Elsewhere, however, they claim that the April 22, 2002 statements were simply "a poor job of explaining the [relevant] accounting change." (Reply at 10.) However, even the excerpts of the article cited by the defendants do not dispel the implication that Demetriades and Plaga were at least deliberately or consciously reckless. (*See id.*)

made by third parties such as analysts, and that the plaintiff has not adequately pled "analyst entanglement." (Mot. at 23.) The defendants contend that the amended consolidated complaint states only that the third-party statements were based on information provided by the defendants, and that this is insufficient. (*Id.*) The defendants contend that the plaintiff must allege "specific facts showing a two-way flow of information between defendants and these third parties or defendants' adoption of the analysts' reports as their own, i.e. that they were 'entangled.'" (Mot. at 23 (citing *Copperstone v. TCSI Corp.*, 1999 WL 33295869, at *7–*8 (N.D.Cal.); *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir.1996)).)

The Court agrees with the plaintiff's contention, however, that under *Cooper v. Pickett,* "corporate defendants may be directly liable under 10b–5 for providing false or misleading information to third-party securities analysts." 137 F.3d 616, 624 (9th Cir.1997).[12] The only issue is whether those allegations have been pled sufficiently by the plaintiff. As the court in *Copperstone v. TCSI Corp.,* pointed out:

> *Cooper,* therefore, allows a plaintiff to forgo allegations of the defendants' adoption of the analysts' reports if the statements made to the securities analysts, which formed the basis of the report, were misleading and were made with the intent that they be communicated to the market. However, the facts of *Cooper* arose prior to the passage of the Reform Act, therefore the stricter pleading requirements outlined above were not applicable in that case. Plaintiffs must now cast their Complaint pursuant

to the Reform Act. Consequently, any amended complaint must specify each statement to an analyst alleged to have been misleading, succeeded by the reason or reasons why the statement is misleading.

1999 WL 33295869, at *8 (N.D.Cal.) (citing 15 U.S.C. § 78u–4(b)(1)).

A review of the complaint's allegations in this regard reveals that the complaint fails to identify the specific statements to the analysts, and instead generally states only that report was based on information provided by the defendants, the substance of the report, and the reasons why the report was misleading. (*See, e.g.* Am. Consol. Compl. ¶ 84) ("The [analyst's] foregoing statements concerning the Company's ability to achieve profitability in the quarter due to its cost-cutting efforts, that were based on information provided by Defendants, were materially false and misleading because the cost-cutting measures instituted by the Company were not sufficient to achieve fourth quarter profitability.";) *id.* ¶ 91 ("On January 2, 2002, US. Bancorp issued a report based, among other things, upon information provided by Defendants, in which it raised its price target on SeeBeyond from $8 per share to $14 per share with a 'Strong Buy' rating."); *id.* ¶ 107 ("In a report dated January 25, 2002, relying on information conveyed to the market by Defendants, including the conference call with analysts on the previous day, Pacific Growth Equities stated . . . ."); *id.* ¶ 129 ("On April 5, 2002, CIBC World Markets issued a report on SeeBeyond based on information provided by Defendants, including state-

---

12. For the reasons set forth in *Cooper,* the defendants' reliance on *In re Stac Electronics* is misplaced.

> [T]he issue in *Stac* . . . was whether corporate defendants could be held liable for analysts' interpretations of defendants' truthful statements. . . . Our decision[ ] in

*Stac* . . . do[es] not preclude plaintiffs' claims that Merisel made false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market.

*Cooper,* 137 F.3d at 624.

ments made during on [sic] the conference call."). These allegations do not sufficiently identify each statement made to analysts that was allegedly misleading. Therefore, the Court grants the defendants' motion in this regard.

### 2. *The Plaintiff's '33 Act Claims*

The defendants challenge the plaintiff's claims under §§ 12(a)(2) and 11 of the '33 Act. The Court need not address the § 12(a)(2) claim, as the plaintiff has withdrawn it. (*See* Opp. at 27 n. 16.)

#### a. *Standing*

■ Under § 11, purchasers of stock have standing to sue if they can trace their shares to an allegedly misleading registration statement. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999); *Demaria v. Andersen*, 318 F.3d 170, 178 (2d Cir.2003); *Stack v. Lobo*, 903 F.Supp. 1361, 1375 (N.D.Cal.1995) ("Claims may be brought under §§ 11 ... by those who purchased securities in a public offering and by those whose securities are traceable to the public offering.").

The defendants challenge the plaintiff's standing under § 11, arguing that because the plaintiff's complaint "does not—and cannot—specifically allege that plaintiff can trace its stock directly to the Secondary Offering," the plaintiff has no standing to bring a § 11 claim. (Mot. at 26.) The plaintiff responds by arguing that it does in fact make this allegation in the complaint. (Opp. at 27). The plaintiff cites two paragraphs of its complaint in support of this proposition:

> Lead Plaintiff brings this action ... on behalf of all persons who purchased or acquired shares of SeeBeyond common stock between December 10, 2001 and May 7, 2002 ..., including those who acquired shares in connection with, or that are traceable to, SeeBeyond's secondary offering in February 2002 ....

> Lead Plaintiff and the members of the Class purchased SeeBeyond common stock issued pursuant to the Registration Statement/Prospectus filed by the Company with the SEC....

(Am.Consol.Compl.¶¶ 1, 189.)

With respect to paragraph 189, the defendants argue that the plaintiff's admission that it did not purchase its stock directly in the Secondary Offering prevents this allegation from establishing the plaintiff's standing to sue. (Reply at 25.) With respect to paragraph 1, the defendants argue that this allegation is insufficient to establish standing under § 11 because the plaintiff does not allege that its stock purchase was traceable to the Secondary Offering, but rather alleges that the plaintiff "represents a class whose purchases are traceable to the Offering." (Reply at 25–26.)

The Court finds that the allegation in paragraph 189 is sufficient for purposes of standing under § 11. The defendants are incorrect in arguing that § 11 requires the plaintiff to have purchased its stock directly. In *Hertzberg,* the Ninth Circuit expressly distinguished § 11 claims from § 12 claims in this respect. 191 F.3d at 1080. Unlike § 12 claims, § 11 claims need not be premised on direct purchases. 191 F.3d at 1081 ("Section 11 permits suit without restriction by 'any person acquiring such security.' Section 12, by contrast, permits suit against a seller of a security by prospectus only by 'the person purchasing such security *from him*,' thus specifying that a plaintiff must have purchased the security directly from the issuer of the prospectus. 15 U.S.C. § 77l(a)(2) ...." (emphasis in original)).

The Court finds that, in this case, whether the plaintiff is able to trace its stock is not a question that can be resolved on this motion. The Court acknowledges the defendants' argument that it may be

difficult or impossible to trace the stock purchased by the plaintiff, but the plaintiff should be provided the opportunity to prove its allegation in this respect.

Therefore, the Court finds that the plaintiff has standing to assert its § 11 claim.

### b. *Rule 9(b) Pleading Requirements*

The defendants also note that the heightened pleading standards imposed by Rule 9(b) apply to § 11 claims when they sound in fraud. (Mot. at 26.) The defendants argue that the plaintiff's § 11 claims sound in fraud because "they are premised entirely on the allegation that the Registration Statement/Prospectus is false because defendants deliberately 'pulled' the Syngenta revenue into Q4'01 to overstate SeeBeyond's revenues and inflate artificially SeeBeyond's stock price." (Mot. at 27.)

The plaintiff expressly disclaims allegations "that sound or may sound in fraud" in connection with its § 11 claim. (Am.Consol.Compl.¶ 188.) However, such a disclaimer, by itself, cannot preclude a finding that the claim actually sounds in fraud. *See, e.g., Desaigoudar v. Meyercord,* 223 F.3d 1020, 1022 n. 5 (9th Cir. 2000) ("The district court rejected as 'disingenuous' Desaigoudar's claim that the complaint also sounds in negligence.... After carefully reviewing the complaint's language, which asserts 'knowing and intentional' misconduct by the Appellees, we conclude that the rejection was proper."); *see also In re Real Estate Assocs. Ltd. P'ship Litig.,* 223 F.Supp.2d 1142, 1146–7 (C.D.Cal.2002) (same).

The Court need not decide whether the plaintiff's § 11 claim sounds in fraud. In their reply brief, the defendants concede that the only thing the plaintiff is required to allege in order to comply with the pleading requirements of Rule 9(b) is the "condition" in the Syngenta contract. (Reply at 27 ("To satisfy Rule 9(b), plaintiff must identify the 'condition' that supposedly made the Syngenta revenue improperly recognized in Q4'01."); *cf.* Mot. at 28 ("plaintiff fails to plead with particularity why the Syngenta revenue was recognized improperly, when it was improperly recognized or who knew it.").) As noted above, the Court has required the plaintiff to identify the condition for other reasons. Therefore, the Court denies as moot the defendants' arguments regarding Rule 9(b) and the § 11 claim.

## CONCLUSION

Based on the foregoing analysis, the Court grants the defendants' motion in part. The Court grants the plaintiff twenty days leave to amend.

IT IS SO ORDERED.