**In re SYNCOR INTERNATIONAL CORP. SECURITIES LITIGATION.**

Nos. CV 02–8560 LGB (RCx), CV 02–8972, CV 02–9248, CV 02–8575, CV 02–8841, CV 02–9583, CV 02–8687, CV 02–9076, CV 02–9621, CV 02–9640, CV 03–52.

United States District Court, C.D. California.

July 6, 2004.

Andrew J. Brown, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, Edward P. Dietrich, Erin P. McDaniel, Tricia L. McCormick, Darren J. Robbins, Lerach, Coughlin, Stein and Robbins, Betsy C. Manifold, Francis A. Bottini, Jr., Francis M. Gregorek, Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, Theodore M. Hess–Mahan, Thomas G. Shapiro, Shapiro, Grace, Haber & Urmy, Boston, MA, Kevin J. Yourman, Weiss & Yourman, Michael D. Braun, Marc L. Godino, Patrice L. Bishop, Stull, Stull & Brody, Peter Arthur Binkow, Michael M. Goldberg, Lionel Z. Glancy, Glancy & Binkow, Los Angeles, CA, Lauren S. Antonino, Martin D. Chitwood, Chitwood & Harley, Atlanta, GA, W. Mark McNair, W. Mark McNair Law Offices, Daniel S. Sommers, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Robert C. Finkel, Wolf Popper, Emily C. Komlossy, Goodkind, Labaton, Rudoff & Sucharow, New York, NY, Brian M. Felgoise, Brian M Felgoise Law Offices, Philadelphia, PA, Marc S. Henzel, Marc S. Henzel Law Offices, Bala Cynwyd, PA, for Plaintiffs.

Daniel S. Floyd, Dean J. Kitchens, Gail Jeanne Standish, Ted Allan Gehring, Gibson Dunn & Crutcher, Francisca M. Mok, Gordon A. Greenberg, Steven M. Goldsobel, Allan L. Schare, McDermott, Will & Emery, Amy S. Park, Eric S. Waxman, Robert F. LeMoine, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

BAIRD, District Judge.

### I. INTRODUCTION

This is a class action on behalf of purchasers of Syncor International Corporation's ("Syncor") publicly traded securities. The second amended complaint alleges security violations under section 10(b) of the 1934 Act, Rule 10b–5, and section 20(a) of the 1934 Act. Currently before the Court are Defendants' motions to dismiss the second amended class action complaint ("complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b) and section 21D of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Between November 6, 2002 and January 3, 2003 eleven class action complaints were filed against Syncor for securities fraud. On March 4, 2003, the Court consolidated the related cases and appointed lead counsel. On May 19, 2003, Plaintiffs in the consolidated cases ("Plaintiffs") filed their amended class action complaint against Syncor and 12 individual defendants: Robert G. Funari, Monty Fu, Moses Fu, David L. Ward, Jack L. Coffey, Sheila H. Coop, George S. Oki, Henry M. Wagner, Jr., M.D., Gail R. Wilensky, Michael L. Lach, John S. Baumann, and Michael E. Mikity (collectively "Defendants").

On December 15, 2003, the Court granted Defendants' motions to dismiss the consolidated amended complaint. The Court found that Plaintiffs had failed to satisfy the heightened pleading requirements of the PSLRA. Plaintiffs filed a 219–page second amended complaint on January 28, 2004. The second amended complaint adds two defendants: William P. Forster, and Haig S. Bagerdjian. Although the complaint adds more details, the general facts from which the allegations spring remain virtually unchanged.

The complaint alleges that Defendants violated section 10(b) of the 1934 Act, Rule 10b–5, and section 20(a) of the 1934 Act. The complaint is based on the following facts. Syncor provides high technology health care services concentrating on nuclear pharmacy services. *Complaint*, ¶ 1. It operates a national network of over 130 nuclear pharmacies, with 19 pharmacies overseas. Class members purchased Syncor's publicly traded securities between March 9, 1998 and November 5, 2002. *Id.* ¶ 1.

Prior to 1998, Syncor's stock was trading below $8 per share. *Id.* ¶¶ 2–4. Plaintiffs allege that Defendants "embarked on a scheme to increase international operations by paying illegal bribes" to physicians and foreign officials. *Id.* ¶ 5. From at least the mid–1980s through at least September, 2002, several of Syncor's foreign subsidiaries made at least $600,000 in illicit payments to doctors employed by foreign authorities for the purpose of obtaining and retaining business. *Dec. Dietrich, Cease–and–Desist Order*, Exh. 1, at 5. Specifically, Syncor's subsidiaries Syncor Taiwan and Syncor Mexico paid improper fees and entered into "over-invoicing" agreements with doctors to obtain referrals and to increase sales. *Complaint*, ¶¶ 13(a)-(e).

Syncor Taiwan has been doing business in Taiwan since 1985. *Dec. Dietrich, Cease–and–Desist Order*, Exh. 1, at 5. Syncor Taiwan paid improper commissions to doctors from its inception. *Id.* These commissions totaled at least $400,000 from 1985 through September, 2002. In most cases, the commissions were paid in cash and hand-delivered to doctors by Moses Fu, the brother of Syncor's founder and chairman. *Id.* at 5–6; *Complaint*, ¶ 20(c). Beginning in 1998, Syncor Taiwan paid improper fees to doctors at hospitals owned by Taiwan authorities for patient referrals. *Dec. Dietrich, Cease–and–Desist Order*, Exh. 1, at 6. These referral fees totaled at least $113,000 and were also hand-delivered cash payments. *Id.*

Monty Fu is Syncor's founder. *Complaint*, ¶ 2. He was the chairman of Syncor from 1985 until November 2002 and served as chairman of the board of Syncor Taiwan. *Id.* ¶ 20(b). Monty Fu explained to a confidential witness that there was an "Asian practice" of paying its professional clientele in exchange for business. *Id.* ¶ 39. Syncor Taiwan recorded the payments as marketing expenses in the Syncor Taiwan budget. *Id.* Monty Fu allegedly attributed the success of Syncor Taiwan to the payments to doctors, and repeatedly

urged management in other locations to participate in a similar payment plan to increase sales and improve profits. *Id.* ¶¶ 41, 43.

The confidential witness informed Funari that the payments were a problem. *Id.* ¶ 42. Funari has served as chief executive officer (CEO) of Syncor since July 1996, and as president since January 1996. *Complaint,* ¶ 20(a). He joined Syncor in August 1993 as executive vice president and chief operating officer (COO). During the class period, Funari served as a director for Syncor Taiwan. *Id.*

Bagerdjian assumed the role of hosting monthly meetings for international directors in approximately 1999. *Id.* ¶ 44. Bagerdjian consistently referred to Syncor Taiwan as the "shining star model" of Syncor's international business locations. *Id.* He was aware that one reason Taiwan was doing so well was because of its payments to doctors. *Id.* He knew that managers at other locations would not make the payments, but he told a confidential witness that he wanted them to do so. *Id.*

Bagerdjian has served as executive vice president and as president and CEO of Syncor Overseas Ltd. since June 1998. He joined Syncor in 1991 as an associate general counsel and assistant secretary. He became senior vice president, secretary, and general counsel in January 1995, and was appointed senior vice president of Business Development in October 1996. He also served as chief legal officer from June 1998 until June 1999 and continued as secretary until January 2001. *Complaint,* ¶ 20(n).

While Syncor's subsidiaries were engaged in improper payments, the company was issuing statements about its current financial success and future projections. Many of these statements indicated that Syncor's current success and future expectations were attributable to international expansion. Specifically, Plaintiffs set forth 20 different press releases, five annual reports and seven 10–Q quarterly reports, three interviews with defendant Funari, and four conference calls with analysts and stockholders in which Defendants made statements regarding their financial situation. *Id.* at 52–208; *Syncor's Motion,* at 13–15. Plaintiffs allege that these statements artificially inflated the price of Syncor stock because the public would not have purchased the stock at the inflated value, or at all, if they had been aware of the information regarding the improper commissions. *Complaint,* ¶ 218. After Syncor announced an investigation, Syncor stock dropped from $35.92 per share to $22.93 per share within 48 hours. *Id.* ¶ 15.

The subsidiaries' payments were discovered by Cardinal Health, Inc. during the course of a due diligence investigation conducted prior to Cardinal's acquisition of Syncor. *Id.* ¶¶ 210–211. On November 6, 2002, Syncor announced that it was conducting an internal investigation regarding payments in overseas markets. *Id.* ¶ 210. The press release stated that Syncor had met with the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ), and that Syncor intended to fully cooperate. *Id.* Eventually, Syncor negotiated separate agreements with the SEC and the DOJ. *Id.* ¶ 214. Monty Fu ceased to be an officer of the company and agreed to surrender $2.5 million of Syncor common stock—an amount equal to the total fines and penalties imposed by the SEC and DOJ. *Id.* ¶ 213. He also agreed to waive his right to receive a cash severance payment valued at approximately $2.1 million under the terms of his severance agreement with Syncor. *Id.* On December 4, 2002, Cardinal and Syncor announced that the exchange rate for the acquisition had lowered from 0.52 to 0.47 common shares of Cardinal for each common share of Syncor. *Id.* ¶¶ 214.

In December, 2002, the Securities and Exchange Commission issued an order "Instituting Proceedings Pursuant to Section 21C of the Securities and Exchange Act of 1934, Making Findings, and Imposing a Cease–and–Desist Order." *Dec. Dietrich, Cease–and–Desist Order,* Exh. 1. The SEC order finds that: 1) Syncor violated the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"); 2) by improperly recording payments, Syncor violated the books-and-records provision of the FCPA; 3) by failing to devise or maintain an effective system of internal controls to prevent or detect violations, Syncor violated the internal accounting controls provisions of the FCPA. *Id.* at 5. Regarding payments in Syncor Taiwan, the SEC order found that the payments of commissions were known of and approved by Syncor's founder and chairman, among others. *Id.* at 5–6.

Plaintiffs' complaint relies partially upon the SEC order. On March 4, 2004, the Syncor Defendants filed a motion to dismiss the second amended class action complaint; a request for judicial notice; and a notice of joinder in the Outside Defendants' motion to dismiss.[1] The same day the Outside Defendants filed a motion to dismiss the second amended complaint; request for judicial notice; and a notice of joinder in the Syncor Defendants' motion.[2] Defendant Monty Fu filed a notice of joinder in the Syncor Defendants' motion.

Plaintiffs filed a consolidated opposition and a request for judicial notice on April 2, 2004. They filed a corrected consolidated opposition on April 6, 2004. The Syncor Defendants, Outside Defendants, and Monty Fu all filed replies to Plaintiffs' opposi-

tion. On May 24, 2004, Plaintiffs filed a notice of recent authority in support of Plaintiffs' opposition to which the Outside Defendants filed a response. No oppositions have been filed in response to the requests for judicial notice.

## III. Legal Standard

### A. Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint fails to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). A complaint fails to state a claim if it does not allege facts necessary to support a cognizable legal claim. *See Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir.1984).

In reviewing a Rule 12(b)(6) motion, the court must presume the truth of the factual allegations in the complaint and draw all reasonable inferences. *See Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995); *see also Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). In a securities fraud case, a court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 938 (9th Cir.2003) *cert. denied* —— U.S. ——, 124 S.Ct. 433, 157 L.Ed.2d 311 (2003). Dismissal under 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the

---

1. The "Syncor Defendants" consist of: Syncor International Corporation, Robert G. Funari, David L. Ward, Jack L. Coffey, Sheila H. Coop, Michael L. Lach, John S. Baumann, Michael E. Mikity, William P. Forster, and Haig S. Bagerdjian.

2. The "Outside Defendants" consist of independent directors George S. Oki, Henry N. Wagner, Jr., M.D., and Dr. Gail R. Wilensky.

allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (dismissal appropriate only where "plaintiff can prove no set of facts in support of his claim which would entitle him to relief"); *see also Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152 (9th Cir.1989).

▮ The PSLRA raised the pleading standards for private securities fraud claims. *America West,* 320 F.3d at 931. Private litigants must plead both falsity and scienter. *Id.* The standard is higher than that set forth in Federal Rule of Civil Procedure 9(b). *Id.* The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

▮ In the Ninth Circuit, the required state of mind is, at a minimum, one of deliberate or conscious recklessness that strongly suggests actual intent. *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 979 (9th Cir.1999); *America West,* 320 F.3d at 931. If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the complaint must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A); *America West,* 320 F.3d at 931–932. In the Ninth Circuit, courts consider the scienter and falsity requirements at the same time because they are generally strongly inferred from the same set of facts. *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001). The court should consider the complaint, taken as a whole, in determining whether particular facts raise a strong inference that defendants acted with the required scienter. *America West,* 320 F.3d at 932; *Ronconi,* 253 F.3d at 429.

### B. Judicial Notice

▮ A court may take judicial notice of facts that are not subject to reasonable dispute if the facts are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(b). In a motion to dismiss, a Court may take judicial notice of documents attached to or referenced in the complaint without converting the motion into one of summary judgment where the authenticity of the documents are not in dispute. *Branch v. Tunnell,* 14 F.3d 449, 453–54 (9th Cir.1994) *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002). In addition, the court may consider public filings, including SEC filings. *In re Silicon,* 183 F.3d at 986.

## IV. ANALYSIS

Plaintiffs' complaint alleges that Defendants violated section 10(b) of the 1934 Securities Act, Rule 10b–5, and section 20(a) of the 1934 Act. There is no dispute between the parties that Syncor made improper payments in violation of the FCPA. This improper conduct resulted in fines and penalties imposed by the DOJ and SEC. The dispute centers around whether that fraudulent conduct resulted in misleading statements and who had knowledge of the conduct.

### A. Judicial Notice

▮ Plaintiffs ask the Court to take judicial notice of the following documents: three documents referring to the criminal case against Syncor; SEC regulation S–K, codified at 17 C.F.R. § 229.101; three

forms filed by Syncor with the SEC. Syncor Defendants request judicial notice of the following documents: Syncor's Form 10–K document for the fiscal year 2001 and a spreadsheet detailing the daily closing price for Syncor's stock through the class period. The Outside Defendants request that the Court take judicial notice of the Forms 4 and 5 filed with the SEC from at least 1996 through 2002.[3]

The complaint refers to all of the requested documents, or the documents are public filings. *Branch,* 14 F.3d at 453–54; *In re Silicon,* 183 F.3d at 986. All of the documents are capable of accurate and ready determination. Fed.R.Evid. 201(b). No one has objected to the Court taking judicial notice of the documents. Therefore, the Court finds it appropriate to take judicial notice of all of the documents and will refer to them as needed.

### B. 10(b) and 10b–5 allegations

Section 10(b) states that it is unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange, ... any manipulative or deceptive device or contrivance" in violation of the securities rules and regulations. 15 U.S.C. § 78j(b). Rule 10b–5 provides that it is unlawful to use any facility of the national security exchange to "employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(b). It is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Id.*

A plaintiff must plead both the allegedly misleading statements and scienter with particularity under the PSLRA's height-ened pleading requirements. 15 U.S.C. § 78u–4(b)(3)(A); *America West,* 320 F.3d at 931–932. To satisfy the statutory requirement that Plaintiffs plead all facts with particularity, Plaintiffs must provide a list of all relevant circumstances in great detail. *In re Silicon,* 183 F.3d at 984.

The Syncor Defendants claim that Plaintiffs' amended complaint is "fatally deficient in alleging both falsity and scienter." *Syncor Motion,* at 2. The Syncor Defendants state that Plaintiffs have not shown that Defendants knew about and understood the illegal nature of the FCPA violations when making the allegedly false and misleading statements. *Id.* The defendants further allege that Plaintiffs' complaint is "really an attempt to charge Defendants with violations of section 10(b) based on, at most, allegations of mismanagement." *Id.* at 4. While joining in the Syncor Defendants' motion, the Outside Defendants argue that Plaintiffs have not shown any facts to support that the independent directors had any knowledge about the improper payments or any reason to believe that the statements were false. Monty Fu adds that no evidence supports that he knew that the payments to doctors in Taiwan were illegal.

Plaintiffs' opposition contends that the complaint, when taken as a whole, satisfies the heightened pleading requirement for the PSLRA. Plaintiffs assert that they have pled both falsity and knowledge with specificity. Specifically, Plaintiffs' complaint relies on confidential witnesses, insider trading allegations, the SEC investigation, motive and opportunity allegations, and agency principles. Plaintiffs allege that Defendants' statements were false

---

**3.** The Outside Defendants' request for judicial notice contains Wilensky's SEC Form–4 and Form–5 filings from June 26, 1996 through December 31, 2002; Wagner's Form–4 and Form–5 filings from November 15, 1996 through August 28, 2002; and Oki's Form–4 and Form–5 filings from January 25, 1993 through December 31, 2002.

and misleading because of the ongoing improper payments.

### 1. Scienter

#### a. Confidential Witnesses

Plaintiffs' second amended complaint relies on four confidential witnesses. *Complaint*, ¶¶ 20(f); 35–56. Plaintiffs had previously relied upon an informant in their consolidated amended complaint. The Court's order dismissing the consolidated complaint found that Plaintiffs had not provided sufficient details regarding the informant. Plaintiffs have added additional details to the second amended complaint and have identified four informants.

▮ In pleading fraud allegations, Plaintiffs may rely on an anonymous source for information, so long as they plead "corroborating details" when allegations are based on non-public information. *In re Silicon*, 183 F.3d at 985; *In re SeeBeyond Techs., Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1159 (C.D.Cal.2003). "A plaintiff may use an anonymous source to support allegations in a complaint governed by the PSLRA provided the source is described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re SeeBeyond*, 266 F.Supp.2d at 1159, *citing In re Lockheed Martin Corp. Sec. Litig.*, 272 F.Supp.2d 928 (C.D.Cal.2002). Allegations attributed to an unnamed source must be accompanied by enough particularized detail to support a reasonable conviction of the informant's basis of knowledge. *In re SeeBeyond*, 266 F.Supp.2d at 1159 (internal citations omitted). Plaintiffs do not have to disclose the name of their human sources to satisfy this requirement. *Id.*

▮ Plaintiffs identify confidential witness number one (CW1) as a former employee who had regular contact with Syncor's directors and vice presidents and participated in many different meetings with Syncor's directors and vice presidents. *Complaint*, ¶ 20(f). CW1 allegedly participated in several different meetings attended by many of Syncor's upper-level managers. The complaint includes the names of managers who attended the meetings. *Id.* CW1 states that defendant Coop, Senior Vice President of Human Resources and Communications since January 2001, ran the day-to-day operations of the company. *Id.* Funari allegedly consulted her on all matters, and she possessed the power to tell people what to do. *Id.*

The Syncor Defendants protest that Plaintiffs' description of CW1 lacks sufficient details to give credence to the informant's basis of knowledge. *Syncor's Reply*, at 16; *Syncor's Motion*, at 8–9. Plaintiffs must plead sufficient details to support a reasonable conviction of the confidential informant's basis of knowledge. *In re SeeBeyond*, 266 F.Supp.2d at 1159. However, Plaintiffs are not required to plead details to the extent that they jeopardize the confidentiality of the source. *Id.*

In this situation, CW1 is described as a former employee who had regular contact with Syncor's directors and vice president and attended meetings attended by upper-level management. *Complaint*, ¶ 20(f). The confidential informant is the sole basis for the facts alleged regarding Coop's role in the corporation. The Court finds that the complaint does not allege sufficient corroborating details with sufficient particularity to support that the informant would have knowledge of the alleged information. *See In re SeeBeyond*, 266 F.Supp.2d at 1159. The details about both the informant and Coop are generalized, rather than particularized. *See Id.* Specific details such as the informant's job description, job title, dates of employment,

and job responsibilities would help support that the informant has a basis of knowledge. Although Plaintiffs need not provide details that reveal the source of their information, they must plead enough particularized details to support a reasonable conviction of the informant's knowledge. *Id.* Because the Court finds the necessary amount of detail lacking, the information provided by CW1 regarding Coop is unreliable.

■ Plaintiffs identify confidential witness two ("CW2") as a Syncor Director of International Development who worked for the company for approximately 16 years through September 2000. *Complaint,* ¶ 35. CW2 attended regular staff meetings held almost every month for international development between 1994 and 2000; participated in periodic conferences among Syncor's regional managers; personally received all financial reports from all international locations from 1994 until January 1999; was responsible for hiring customs brokers, securing the company's radioactive materials licenses, hiring and training staff, setting up safety programs and reporting the status of all business developments and operations in the company's international locations to defendants Monty Fu and Funari. *Id.* ¶¶ 35–37. Defendants do not dispute the sufficiency of details regarding CW2, and the Court finds that a person in CW2's position would possess the information alleged.

CW2 alleges that in 1997, CW2 met with Monty Fu, "who explained that there was an 'Asian practice' in China (Taiwan) and that Syncor Taiwan was participating in this practice and paying its professional clientele in exchange for business." *Complaint,* ¶ 39. In a subsequent monthly meeting in which Monty Fu and CW2 participated, CW2 noticed that five percent of the company's budget for Taiwan was allocated for "marketing." *Id.* According to CW2, the typical international budgets included only 1.5 to 2 percent for all marketing and promotions. *Id.* Defendant Monty Fu explained in the meeting that Syncor Taiwan's marketing budget and expenditures were five percent because doctors were being paid out of the marketing budget.[4] *Id.* Although CW2 identifies the names of several people who participated in the exchange, Monty Fu is the only one of those persons who is named as a defendant in this case. *Id.*

CW2 also testifies that CW2 attended a meeting in 1998 at Hotel Nikko Mahanakom in Bangkok, Thailand. *Complaint,* ¶ 40. The meeting was hosted by Monty Fu, and Funari was present. All business development management attended the meeting, as did all international business office management. *Id.* Monty Fu allegedly advised other attendees that they could raise prices and improve profits if they bought off doctors. *Id.* ¶ 41. He urged managers at other locations to participate in the same payment scheme that was going on in Taiwan. *Id.* Funari allegedly turned ⁀red when these comments were made. *Id.* at 42. CW2 rode down the hotel elevator with Funari alone and informed Funari that the payment practice was "a problem" and that the two should discuss the issue. *Id.* Although Funari indicated a willingness to talk, the two did not discuss the issue further. *Id.*

Directors of other Syncor subsidiaries (Syncor Philippines and Syncor Thailand) later told CW2 that Monty Fu had contacted them and urged them to pay doctors in their locations. *Id.* ¶ 43. Monty Fu also contacted pharmacy managers in international locations and urged them to adopt the payment practices he believed attributed to Syncor Taiwan's success—namely

---

4. CW2 alleges that with the help of an assistant he calculated that the money was actually spent for marketing in Taiwan in 1997–98. *Complaint,* ¶ 55.

Syncor Taiwan's revenue growth from $1 million in 1994 to approximately $10 million by 2000. *Id.*

In approximately 1999, Bagerdjian assumed the role of hosting monthly meetings for international directors instead of Monty Fu. *Id.* ¶ 44. He consistently referred to Taiwan as the "shining star model" of Syncor's international business. He would make such references in the presence of all attendees, including CW2 and sometimes Monty Fu. *Id.* In a private meeting with Bagerdjian, CW2 informed Bagerdjian that one reason that Taiwan was doing so well was because of its payments to doctors and that other locations would not "do the same." *Id.* Bagerdjian questioned why they would not, and expressed his desire that the practice be employed in other Syncor international locations to improve business and grow revenues. *Id.*

Confidential witness three (CW3) was an inside sales and marketing coordinator for approximately 10 months in 2002 at Syncor de Mexico. *Id.* ¶ 45. CW3 reported directly to the director of this subsidiary, Frederico Alvarez, who reported directly to Jay Simon, who reported to defendant Funari. *Id.* ¶ 45. Upon employment at the company, CW3 immediately became aware of the company's practice of paying local doctors as a marketing effort to obtain and improve business. *Id.* When CW3 expressed concern about the practice, Alvarez responded that "this is the way things are done here in Mexico."

■ The only defendant mentioned by name in the Syncor de Mexico allegations is Funari. However, there is no evidence indicating that Funari was aware of the payment practices in Mexico. The mere fact that someone reported to another who reported to Funari does not raise a strong inference that he knew of or participated in the fraudulent practice in Mexico while it was occurring. *See Kushner v. Beverly*

*Enters., Inc.,* 317 F.3d 820, 828 (8th Cir. 2003) *rehearing en banc denied* (2003).

Plaintiffs identify confidential witness four ("CW4") as "a former executive director" who was with the company from some time prior to the class period through February, 2002. He and the executive directors were considered part of Syncor's "executive team" and met at least once each month at the month's end. CW4 identifies other persons who were in attendance at the meetings. *Complaint,* ¶ 51. CW4 states that all aspects of the company's operations were discussed at the meetings, and Coop would occasionally attend. *Id.* ¶ 52. CW4 testifies that Jay Simon received input from various financial reports, and Haig Bagerdjian was very involved with Monty Fu in running the Far East business. *Id.*

Defendants argue that CW4 is not sufficiently identified to create a reasonable conviction of the informant's basis of knowledge. *Syncor's Motion,* at 11; *Syncor's Reply,* at 16. The Court finds that the executive director is described with sufficient particularity to support the probability that a person who occupies that position would possess the limited information CW4 provides in the complaint. *See In re SeeBeyond,* 266 F.Supp.2d at 1159.

■ The information provided by the confidential witnesses supports that Monty Fu, Funari, and Bagerdjian were aware of payments being made to doctors in Taiwan. CW2 supplied all of the detailed information regarding these defendants. The Syncor Defendants point out that some of CW2's testimony pertains to incidents which occurred prior to the beginning of the class period. The Court finds that such information is still relevant as to whether the defendants possessed scienter. *See In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 72 (2nd Cir.2001) (finding pre-class data relevant to establish that

defendant had a basis for knowledge); *In re U.S. Aggregates, Inc. Secs. Litig.*, 235 F.Supp.2d 1063, 1068 n. 3 (N.D.Cal.2002) (finding post-class period information relevant to establishing motivation). "Any information that sheds light on whether class period statements were false or materially misleading is relevant." *In re Scholastic*, 252 F.3d at 72.

The Syncor Defendants also object that there are no allegations that Monty Fu or anyone else at Syncor knew that any referral fees were paid to *government officials*, which they allege is a necessary predicate to an FCPA violation. *Syncor's Motion*, at 24–25. An FCPA violation is not required for a section 10b or Rule 10b–5 violation. Regardless, the SEC found that Syncor's subsidiaries made payments to doctors employed by hospitals controlled by foreign authorities who were "foreign officials" within the meaning of the FCPA. *Dec. Dietrich, Cease and Desist Order,* Exh. 1, at 5–6, 8. These payments violated the anti-bribery provision of the FCPA. *Id.* at 8.

Syncor's subsidiaries also made payments to private parties in foreign countries (doctors at private hospitals). *Id.* at 5–6, 8–9. These payments violated Exchange Act sections 13(b)(2)(A) and 13(b)(2)(B) because Syncor failed to make and keep accurate books, records, and accounts, and because Syncor failed to devise and maintain an effective system of internal controls to prevent or detect violations of the FCPA, which itself violated the FCPA. *Id.* at 8–9. The SEC's cease-and-desist order finds that the payments to the doctors in both private and public hospitals were made with the "knowledge and approval of senior officers of the relevant Syncor subsidiaries, and in some cases with the knowledge and approval of Syn-

cor's founder and chairman of the board." *Id.* at 5–6. The cease-and-desist order also finds that Monty Fu and other officials authorized payments which violated the FCPA and securities laws. These illegal payments were made to both "federal officials" within the meaning of the FCPA and non-federal officials. Both types of payments resulted in violations of the FCPA.

Defendants also argue that Syncor's criminal plea does not establish the requisite contemporaneous knowledge of illegal conduct on the part of any defendant. *Syncor's Motion*, at 26. Defendants rely on an Eighth Circuit case to support their position, *Kushner*, 317 F.3d at 829. In *Kushner*, the Court remarked that a guilty plea cannot be used to demonstrate knowledge by hindsight. *Id.* The plaintiffs in *Kushner* failed to allege particular facts demonstrating scienter, instead alleging generally that the defendants were aware of noncompliance with Medicare regulations. *Id.* at 827. The *Kushner* plaintiffs failed to demonstrate that the defendants had actual knowledge. *Id.* at 828–29. Instead, the plaintiffs relied in part on a guilty plea of a subsidiary to infer knowledge. The court found that the guilty plea of the subsidiary was limited in scope to the wrongful conduct of a handful of employees and did not demonstrate a company-wide scheme about which the defendants should have known. *Id.* at 829. In addition, the court remarked that the plea could not be used to show knowledge by hindsight. *Id.*

The plea in this case refers to the acts of the Chairman of the Board of Syncor Taiwan.[5] *Dec. Dietrich, Criminal Plea,* Exh. 3, at 50–52. The Chairman of the Board of Syncor Taiwan was Monty Fu who was

---

5. The plea was entered into by Syncor's subsidiary Syncor Taiwan, Inc. and the stipulated facts in support of the plea refer only to the acts by the subsidiary and the Chairman of the Board. *Dec. Dietrich, Criminal Plea,* Exh. 3, at 49–52.

also Syncor's founder and the chairman of Syncor International. *Complaint*, ¶¶ 2, 20(b). The Court, however, has independently found that Plaintiffs have alleged specific corroborating facts sufficient to demonstrate that Monty Fu, Funari, and Bagerdjian were aware of the illegal payments at the times that they were being made. This finding is bolstered by the cease-and-desist order which does not pertain to only a subsidiary of Syncor, rather it applies to Syncor International Corporation. The Ninth Circuit has considered administrative investigations and settlements in evaluating scienter. *See America West*, 320 F.3d at 942. Therefore, the Court finds it appropriate to consider the SEC investigation, the cease-and-desist order, and the criminal plea agreement in evaluating the scienter of defendants Monty Fu, Funari, and Bagerdjian.

Defendants argue that the evidence does not support that they knew that the payments were illegal. They argue that without such knowledge they could not have made statements or omissions with the required state of mind. The required state of mind in the Ninth Circuit is at a minimum deliberate or conscious recklessness. *In re Silicon*, 183 F.3d at 979. Plaintiffs must plead in great detail facts that constitute strong circumstantial evidence of deliberate recklessness or conscious misconduct. *Id.* at 974. "Recklessness" is:

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990). To allege a strong inference of deliberate recklessness

Plaintiffs must state facts that come closer to demonstrating intent as opposed to mere motive and opportunity. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir.2002); *In re Silicon*, 183 F.3d at 974. There is no bright-line rule for determining when plaintiffs set forth sufficient details or create a sufficiently strong inference of deliberate recklessness. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir.2003).

The Court considers the complaint as a whole when determining whether the Defendants had the requisite degree of scienter. *America West*, 320 F.3d at 932. The Court has determined that Monty Fu, Funari, and Bagerdjian knew of the payments. The Court will now consider additional facts in the complaint to determine whether they knew the payments were illegal.

CW2 had informed Funari that the payments were "a problem." *Complaint*, ¶ 42. Funari has been chief executive officer of Syncor Taiwan since July, 1996, and president since January, 1996. During the class period, he served as director of Syncor Taiwan. *Id.*, ¶ 20(a).

Similarly, CW2 had informed Bagerdjian that other locations would not pay bribes to doctors. *Complaint*, ¶ 44. Bagerdjian has served as executive vice president and as president and CEO of Syncor Overseas Ltd. since June 1998. He became senior vice president, secretary, and general counsel in January 1995, and was appointed senior vice president of Business Development in October 1996. He also served as chief legal officer from June 1998 until June 1999 and continued as secretary until January 2001. *Complaint*, ¶ 20(n).

Monty Fu knew that the payments to doctors were recorded as "marketing." *Complaint*, ¶ 39. The payments were paid in cash and hand-delivered by Monty Fu's

brother. *Dec. Dietrich*, Exh. 1, at 6. Monty Fu is Syncor's founder. *Complaint*, ¶ 2. He was the chairman of Syncor from 1985 until November 2002 and served as chairman of the board of Syncor Taiwan. *Id.* ¶ 20(b).

The Court believes that the complaint, when considered as a whole, supports that Monty Fu, Funari, and Bagerdjian possessed either actual knowledge or acted with deliberate recklessness with regard to the illegal payments. Their knowledge of the payments, positions in the company, receipt of CW2's warnings, and the method of making the payments all create a strong inference that they actual knew or were deliberately reckless in not knowing that the payments were illegal.[6]

In summary, the Court finds that the confidential witnesses and the SEC cease-and-desist order support that defendants Monty Fu, Funari, and Bagerdjian were aware of the improper payments made by Syncor Taiwan's high-level employees. The facts support that they acted with, at a minimum, deliberate recklessness. The confidential witnesses fail to plead with particularity the scienter of the remaining individual defendants. *In re Silicon*, 183 F.3d at 979. The Court will examine *infra* the Syncor Defendants' argument that the complaint fails to link any of the allegedly false and misleading statements to a particular defendant. *Syncor Reply*, at 10.

### b. Insider Trading

▆▆▆ Plaintiffs allege that all of the individual defendants engaged in insider trading with three exceptions: Moses Fu, Forester, and Bagerdjian did not sell any Syncor stock during the class period. Unusual or suspicious stock sales may constitute circumstantial evidence of scienter. *In re Silicon*, 183 F.3d at 986. Insider

trading is suspicious only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* (internal citations omitted). Relevant factors include: 1) the amount and percentage of shares sold by insiders, 2) the timing of the sales, 3) whether the sales were consistent with the insider's prior trading history. *Id.* Stock sales alone are not inherently suspicious unless accompanied by the above factors. *In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1092 (9th Cir.2002).

In this case, the Court views the allegations of insider trading with heightened scrutiny considering the length of the class period—approximately four years and eight months. The Ninth Circuit has previously noted that a class period of sixty three weeks is an "unusually long class period." *Id.* at 1092. In that case, the court was skeptical that the longer class period allowed the plaintiffs to "sweep as many stock sales into their totals as possible." *Id.*

▆▆▆ Plaintiffs allege that Syncor's officers and directors sold 1,187,011 shares of stock for more than $31 million in allegedly illegal trading proceeds. These sales allegedly totaled 29 percent of the officers' and directors' collective holdings of Syncor stock. *Complaint*, ¶ 71.

In evaluating stock sales, it is appropriate to consider stock shares plus a person's exercisable stock options. *In re Silicon*, 183 F.3d at 986–987. The Outside Defendants have noted that when the unexercised vested options are added to the amount of holdings at the end of the class period the percentages of shares sold, as calculated by Plaintiffs, decrease

---

**6.** Although the Court considers the defendants' positions in the company as one factor in determining scienter, their positions can-

not be the sole basis of such a finding. *See,* group pleading analysis, at 1171–72, *infra.*

with regard to the three independent directors. *Outside Motion,* at 19. The Outside Defendants allege that the correct numbers show that over the four-and-a-half year class period, Wilensky sold 40.5 percent of her total holdings for net proceeds of approximately $567,000; Oki sold 47.3 percent of his total proceeds of approximately $700,000; and Wagner sold 82 percent of his total holdings for net proceeds of approximately $1.85 million.[7] *Id.; Request Judicial Notice, Oki, Wagner, Wilensky, ("RJN Oki"),* Exh. A–1–A–16, B–1–B–25, C–1–C–26. The Syncor Defendants assume that Plaintiffs' calculations regarding stock sales and holdings are accurate, but acknowledge that the Outside Defendants question their accuracy. *Syncor Motion,* at 7, n. 4.

Large numbers of stock sales by themselves do not necessarily create a strong inference of fraud. *In re Vantive,* 283 F.3d at 1093. Rather the court must find the stock sales to be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* at 1092. Courts should look at the context of the sales in order to determine the amount of weight to attach to their timing. *Id.*

The timing of the defendants' stock sales did not occur at Syncor's peak trading price. Syncor's stock peaked at $43 during the class period. *Request Judicial Notice, Syncor,* Exh. 2, at 132. Almost all of the defendants sold their shares when the prices were well below the peak. *Complaint,* at 29–34. Oki is the lone defendant who sold shares valued at more than $40, and he sold 2196 shares for $41.37. This is a small percentage of the 34,896 total shares he sold during the class period. When a defendant "misses the boat" by selling before the stock reaches its peak, it indicates that the defendant is not operating on "insider knowledge." *In re Vantive,* 283 F.3d at 1093–94. Here, basically all of the defendants "missed the boat" with their sales.

Plaintiffs state that the timing of the sales is suspicious because the average closing price of Syncor stock in the year prior to the class period was $6.56 while the average prices of Defendants' class period sales were $25.143–$34.269. *Complaint,* ¶ 73. Plaintiffs allege that the defendants' sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Complaint,* ¶ 74. However, in summarizing the sales of each defendant, Plaintiffs do not allege facts which support that the sales were calculated to "maximize the personal benefit from undisclosed inside information." *In re Silicon,* 183 F.3d at 986. Plaintiffs fail to support that the sales correspond with inside information. For example, there are no allegations that the sales were made immediately before press releases or major events—such as Cardinal's due diligence investigation prior to acquisition.

Plaintiffs generally state, "While Syncor's top insiders were issuing favorable statements about Syncor, the defendants sold 1.2 million shares of stock for more than $31 million to personally profit from the artificial inflation of Syncor's stock price which their fraudulent scheme had created." *Complaint,* ¶ 86. Plaintiffs fol-

---

7. The Court notes that the adjusted percentage for Wagner (i.e. the percentage which includes the unexercised vested options) is higher than that alleged in the Complaint, not lower. The Complaint's chart states that Wagner sold 61.36 percent of his holdings; the Outside Defendants state that the amount should decrease by 6 percent, but then increase the percentage to 82 percent. *Cf. Complaint,* ¶ 72; *Outside Defendant's Motion,* at 15, 19. None of the parties address this discrepancy.

low this assertion with several blocks of Syncor's statements which occurred over a series of several months and the amount of stock sales in those months. *Id.* ¶¶ 90–95. These generalized allegations do not sufficiently establish a correlation between the stock sales and the statements. Paragraph 95 of the complaint is telling. This paragraph sets forth several statements without dates, and then states, "On the heels of these positive statements defendants sold 123,000 shares for over $3.3 million in proceeds." *Id.* ¶ 95. These paragraphs in the Complaint do not support that the timing of the stock sales corresponded to inside information.

Although Defendants' motions to dismiss provide additional arguments to support that they did not engage in insider trading, the Court does not need to expound upon them because there is nothing "unusual" or "suspicious" about the amount or timing of the stock sales over the four-year-and-eight-month class period. *In re Silicon,* 183 F.3d at 986. The facts support that the defendants were riding the stock boom of the late nineties, but they do not support insider trading allegations.

 Although insider trading may constitute circumstantial evidence of scienter, a lack of insider trading does not necessarily negate scienter. *America West,* 320 F.3d at 944. For example, Monty Fu is alleged to have sold 8.45 percent of his holdings. *Complaint,* ¶ 72. In addition, he made no sales after March 2001, over 19 months before the end of the class period.[8] *Complaint,* ¶ 71. Monty Fu sold stocks on three different occasions. He sold 136,000 shares for $20.20 per share on

April 28, 2000; 5,000 shares for $34.00 per share on March 8, 2001; and 32,500 shares on March 9, 2001 for $32.070 per share. These stock prices fall far below the $43 high.

The sale of shares at amounts significantly lower than the stock's ultimate peak indicates that there is no strong inference of scienter. *In re Vantive,* 283 F.3d at 1093–94. Similarly, a low percentage of stock sales from a defendant's total number of stock tends to negate an inference of insider trading. *Id.* at 1094. However, Plaintiffs note that Monty Fu could have financially profited from Syncor's merger with Cardinal Health.[9] *Opposition,* at 40; *Complaint,* ¶¶ 107–112. The lack of stock sales by a defendant is not dispositive as to scienter. *America West,* 320 F.3d at 944.

The Court concludes that the stock sales do not support that Defendants engaged in insider trading. However, the lack of Monty Fu's stock sales does not preclude a finding of scienter if other factors support its existence. Insider trading is only one consideration in determining whether statements were misleading and made with deliberate recklessness. *In re Vantive,* 283 F.3d at 1092–93.

#### c. Motive

 Plaintiffs contend that Defendants had the motive and opportunity to perpetrate a fraudulent scheme because of the company's stock and incentive plans. *Complaint,* ¶¶ 97–113. Specifically, Plaintiffs allege that Defendants' bonus incentives, stock purchase program, and merger-related motives motivated Defendants

---

8. Plaintiffs note that Monty Fu and Funari could not sell any of their personal shares after June 16, 2002 because of a support/voting agreement they had entered into with Cardinal Health. *Opposition,* at 40. Although Plaintiffs attach the proxy for support, they do not direct the Court to the relevant page or section of the 172 page document.

9. Plaintiffs' Opposition states that Cardinal Health originally agreed to pay a premium for Syncor stock of 15 percent over its trading value. *Opposition,* at 40. However, Plaintiffs do not indicate where this information is found in the Complaint or in any of the judicially noticed documents. The Court will not rely on this assertion.

to deceive Plaintiffs. *Opposition*, at 41. Defendants contend that a program which permitted the Syncor directors to align their interests with those of the company's shareholders was not improper and does not support an inference of wrongdoing.

In 2000, Syncor adjusted its incentive bonus plan and its long-term based incentive compensation plan. *Complaint*, ¶¶ 97–103. Under the adjusted incentive bonus plan, the company's overall performance—as measured by Syncor's return on assets—was a consideration in determining whether officers were eligible for bonuses ranging between 50–85 percent of their base salaries. *Id.* ¶ 98. Under the long-term based plan, senior management received a bonus compensation equal to one to two times their annual salary if stock traded at or above the target level for 10 out of 20 consecutive days. *Id.* ¶ 100. After changes made in 2000, the compensation was paid primarily in stock options. *Id.* ¶ 101. The largest bonuses actually received during the class period by the executive officers under both plans occurred in 1998. *Id.* ¶ 99, 103. None of the defendants received bonuses in 2001. *Id.* ¶ 99.

The 1998 senior management stock purchase plan permitted select employees and directors to purchase up to 1,000,000 shares of Syncor stock to be paid with a five-years secured promissory note to the company. *Id.* ¶ 104. In 2001, the company instituted stock buyback programs in which the company bought back at fair market value virtually all of the shares purchased by the participants. *Id.* ¶ 105. Participants profited from the buy-back and had their promissory notes extinguished. *Id.* ¶ 105–06.

While merger discussions were going on, Syncor entered into new severance agreements with Syncor officers and defendants Monty Fu, Funari, Coffey, Coop, Forster, Baumann, and Bagerdjian. *Id.* ¶ 109.

These agreements provided generous benefits and severance packages for the executives if they were terminated without cause in the subsequent 24 months. *Id.* ¶¶ 109–111. In June 13, 2002, Syncor amended its long-term incentive plan to provide that upon approval of a merger, the director's options would immediately vest. *Id.* ¶ 111.

On December 3, 2002, Syncor entered into an agreement with Monty Fu. Fu was forced to resign as an officer and director at Syncor prior to the company's merger with Cardinal. He surrendered $2.5 million worth of Syncor stock (equaling the total fines and penalties paid to the DOJ and the SEC). He also agreed to waive his rights to receive severance payments under his August 24, 2001 agreement with Syncor, totaling $2.1 million.

Motive in the form of stock options and bonuses can be a factor in establishing scienter. *See e.g., America West,* 320 F.3d at 944. However, generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirement. *Id.* Courts have found that a defendant's motive to increase his or her compensation is insufficient to show a strong inference of scienter. *In re Calpine Corp. Secs. Litig.,* 288 F.Supp.2d 1054, 1087 (N.D.Cal.2003). To hold otherwise would create a strong inference of scienter whenever an executive's compensation is tied to the performance or stock price for a company for which he or she works. *Id.*

In this case, the restructuring of the bonus plans provided greater bonuses in the form of stock options. However, this restructuring did not result in over-all increases in compensation. After the class period began, bonuses decreased. The amount of bonuses peaked in 1998, before the changes were implemented. *Complaint,* ¶¶ 99, 103. Increased stock values benefit shareholders as well as executive

officers. Therefore, the Court finds that the officers' incentives to strengthen the stock price do not alone establish a strong inference of scienter. The Court will consider this as one factor in determining whether Plaintiffs have established scienter.

#### d. Scheme

■ The Court previously found that Plaintiffs' allegation did not sustain a "scheme" allegation. Plaintiffs argue again that all defendants are liable because they participated in Syncor's scheme to defraud. A person may be held liable in the Ninth Circuit for participation in a scheme. *In re Homestore*, 252 F.Supp.2d at 1039–1040. However, Plaintiffs must allege that every defendant committed his own independent primary violation of the securities laws. *Id.* While considering the complaint as a whole, the Court will consider the existence of a scheme if Plaintiffs have shown that every defendant allegedly participating in the scheme committed a securities law violation.

In summary, the Court concludes that CW2 provides particularized details about Monty Fu, Funari, and Bagerdjian to support a strong inference that they knew that Syncor Taiwan employees were making improper payments to doctors. Plaintiffs' allegations against the other individual defendants do not support a finding that they possessed scienter. Plaintiffs correctly note that the Court must consider whether the complaint, when taken as a whole, raises a strong inference that Defendants acted with the required scienter. *America West*, 320 F.3d at 932; *Ronconi*, 253 F.3d at 429. The Court will further consider whether the facts taken as a whole support a finding of scienter when evaluating the falsity of the statements below. the Ninth Circuit, courts consider the scienter and falsity requirements at the same time because they are generally strongly inferred from the same set of facts. *Ronconi*, 253 F.3d at 429.

#### 2. False or Misleading Statements

■ Plaintiffs must specify each statement alleged to be misleading, the reasons why it is misleading, and all facts on which the belief is formed (if the allegation is made on information and belief). 15 U.S.C. §§ 78u–4(b)(1), (2). Plaintiffs must state all facts supporting their belief that the statement is misleading with particularity. *Id.; In re Silicon*, 183 F.3d at 983–84. The Ninth Circuit requires Plaintiffs to provide a list of all relevant circumstances in great detail to support the basis for their belief that the statements are false. *Id.* To meet the heightened pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or deliberately reckless false or misleading nature of the statements when made. *In re Read–Rite*, 335 F.3d 843, 846 (9th Cir.2003).

■ Plaintiffs set forth numerous statements spanning the course of four years and eight months made by Syncor which were allegedly false or misleading. The first set of statements were made on March 9, 1998. On that date, Syncor issued a press release entitled "Syncor Reports 45 Percent Increase in Income from Continuing Operations for Year Ended Dec. 31, 1997." *Complaint,* ¶ 114. The financial results for fiscal year 1997 were repeated in the company's 1997 SEC Form 10–K, filed on March 31, 1998. The 10–K was signed by Monty Fu, Funari, Bagerdjian, Mikity, Oki, Wagner, and Wilensky. *Id.* ¶ 115. Plaintiffs assert that the financial results were misleading as were the statements, "Our financial results for 1997 reflect the successful implementation of four key strategies which were targeted at driving increased sales and earnings," and,

"These strategies were to accelerate the pace of international market expansion and to expand Syncor's scope of business operations." *Id.* ¶ 116. Plaintiffs allege that the truth was that Syncor had begun increasing sales and earnings in its international subsidiaries by paying illegal bribes. *Id.*

Although Plaintiffs allege that the increased sales were a result of illegal bribes, they do not plead facts that support this assertion. The SEC cease-and-desist order indicates that Syncor's subsidiaries made at least $600,000 in illegal payments from at least the mid–1980s through at least September, 2002. *Dec. Dietrich, Cease–and–Desist Order,* Exh. 1, at 5. The improper commissions in Taiwan totaled at least $400,000, and Syncor Taiwan made the improper payments since its inception in 1985 through September, 2002. *Id.* Beginning in 1998, Syncor Taiwan paid at least $113,000 in patient referral fees. *Id.,* at 6. Prior to the class period, Syncor's stock was a "very poor performer" trading at less than $8 per share. *Complaint,* ¶ 4, see also, ¶¶ 2–3.

In other words, some of Syncor's subsidiaries had been making improper payments for over a decade in 1997 without resulting in increased sales. Therefore, it does not follow that Syncor's increase in sales and earnings in 1997 was attributable to its international subsidiaries paying illegal bribes. Moreover, Plaintiffs fail to state details which support how the financial results were impacted by the improper payments made by international subsidiaries. *See In re Vantive,* 283 F.3d at 1091 ("there is no sufficient allegation of the amounts by which revenues were allegedly overstated.").

In addition, the facts suggest that most of the international subsidiaries refused to pay bribes. Monty Fu allegedly repeatedly urged directors of other Syncor international subsidiaries and pharmacy managers to pay bribes to increase their profits. *Complaint,* ¶¶ 41, 43. CW2 informed Bagerdjian that other locations would not make improper payments. *Id.* ¶ 44. This testimony indicates that Syncor's subsidiaries did not universally make illegal bribes. The complaint only provides facts about Syncor Mexico and Syncor Taiwan making improper payments. Therefore, the facts do not support that Syncor's increased sales and earnings were primarily attributable to paying illegal bribes.

Finally, Syncor's overseas revenues represented less than five percent of the company's total revenue. *Complaint,* ¶ 152. Syncor Taiwan represented only a percentage of those international revenues. As a result, improper payments in Taiwan do not support that reports of Syncor's company-wide growth were false or misleading because of the improper conduct of a few directors.

Plaintiffs also allege generally that the Form 10–Ks were false and misleading. *Opposition,* at 27. An officer or director of a corporation who signs a fraudulent Form 10–K with the requisite level of scienter can be liable as a violator of section 10(b) for making false statements. *Howard v. Everex Sys., Inc.* 228 F.3d 1057, 1061 (9th Cir.2000) (reviewing a district court's ruling in support of a JMOL); *Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 365 (5th Cir.2004) (stating that a corporate officer may be held liable for corporate statements if a signature on a document or factual allegations link the individual defendant to the statement). Therefore, the defendants who signed the form 10–Ks can be liable for fraudulent statements if they either knew the contents of the documents were false or acted with deliberate recklessness.

Plaintiffs' opposition to Defendants' motion to dismiss argues that Defendants are liable for the company's Form 10–K filings

because the filings state, "Our international operations also are subject to various local laws, rules and regulations. We believe that we are in substantial compliance with all material laws and regulations applicable to our businesses." *Opposition,* at 27. Plaintiffs also generally allege that by signing Syncor's SEC filings, Defendants made false statements in violation of section 10(b). *Opposition,* at 43.

The Complaint does not specifically refer to Syncor's 10–K statement that the company is in substantial compliance, nor does it plead specific facts detailing what part of the SEC filings are false. When referring to the SEC filings in the Complaint, Plaintiffs state generally that the financial results are false because of a bribery scheme. The generalized allegations do not support a finding of a PSLRA violation because they fail to plead with particularity why the statement is misleading. *America West,* 320 F.3d at 932.

The Court finds that the March 9, 1998 press release fails to satisfy the heightened pleading requirement of the PSLRA. Plaintiffs have not shown that Syncor's statements regarding the general financial success of the company were false and misleading. A complaint must plead the misleading statements and scienter with particularity to avoid dismissal. *Id.*

Plaintiffs also contend that Syncor's 1997 Annual Report, distributed on March 31, 1998 contained several false or misleading statements. *Complaint,* ¶ 117. Plaintiffs specifically allege that the following statements are false and misleading:

- "This section highlights what Syncor is doing to ensure that this initial wave of rapid growth will be followed by another wave of equal—if not greater—scope and significance;"
- "Syncor is currently building foundations for the establishment of businesses in relatively underdeveloped international healthcare services markets;"
- "In Taiwan, which has one of Asia's most advanced health-care communities, Syncor is now profitably operating three radiopharmacies and has begun to expand into other types of medical services;" *Id.* ¶ 118.
- "Syncor's greatest growth after 2001 is expected to come from international operations;" and
- "Through strategic partnering arrangements, we plan to expand into Europe and further into Asia and Latin America during 1998. By the end of the year, Syncor intends to have a total of 20 international pharmacy service centers on six continents." *Id.* ¶ 119.

According to Plaintiffs, the statements are misleading because Syncor knew that it was not growing due to any legitimate business reasons. Similarly, Syncor's future growth would not come from legitimate partnerships, but rather from "the result of the bribery scheme they were successfully implementing in Taiwan and Mexico." *Id.*

The Court finds that legitimate business reasons exist for the company's general financial success in the United States and overseas. As the press release states, "More than half of the world's nuclear medicine market lies outside of the U.S., and is for the most part, currently underserved." *Complaint,* at 57. The company explains a legitimate reason for its expansion in the overseas market. Plaintiffs do not support that the company would be unable to achieve the results it projected, or that it did not achieve the success it anticipated. *See, e.g., In re Vantive,* 283 F.3d at 1089 ("It is difficult to find a 'strong inference' that Vantive deliberately misled investors because it is fully possible that Vantive eventually *did* recognize $19

million on the contract"); *In re Lockheed,* 272 F.Supp.2d at 943–44 (finding that Plaintiffs had failed to plead facts indicating why Lockheed would be unable to meet its projections absent the signing of a contract referenced to in an allegedly misleading statement). As set forth above, Plaintiffs have not pled sufficient particularized facts to support that the statements regarding the company's over-all financial success or projections are false and misleading.[10]

Syncor's 1997 Annual Report also makes particularized statements regarding Syncor Taiwan. Defendants state, "In Taiwan, which has one of Asia's most advanced health-care communities, Syncor is now profitably operating three radiopharmacies and has begun to expand into other types of medical services." *Complaint,* ¶ 118. Defendants tout the success of Syncor Taiwan without revealing that the company has engaged in illegal payments since 1985. Monty Fu, the director of Syncor Taiwan, allegedly attributed Syncor Taiwan's success to the payments. *Id.,* ¶ 41. The Court's previous order found the information regarding payments made in violation of the Foreign Corrupt Practices Act material. Rule 10b–5 makes it unlawful to make any "untrue statement of a material fact or to omit to state a material fact" that would make a statement misleading. An omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information available." *America West,* 320 F.3d at 934 *citing Basic, Inc. v. Levinson,*

485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

In this situation, the failure to reveal that Syncor Taiwan was engaging in illegal payments altered the "total mix" of information regarding the subsidiary's success. Some cases support that Syncor, having touted the success of Syncor Taiwan, is obligated to disclose information concerning the source of its success. *In re Providian Fin. Corp. Secs. Litig.,* 152 F.Supp.2d 814, 824–25 (E.D.Pen.2001) ("Having put the issue in play, Providian is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."); *In re ATI Techs., Inc. Secs. Litig.,* 216 F.Supp.2d 418, 436 (E.D.Penn. 2002) (finding statements regarding success of Rage line of chips misleading; "Accurately depicting successful financial performance, but attributing the performance to the wrong source is misleading under the securities laws."). Under the logic of these opinions, Defendants' omission to state information about the improper payments makes the statements regarding Syncor Taiwan's success misleading and unlawful. 17 C.F.R. § 240.10b–5(b).

However, the Ninth Circuit has stated: To be actionable under the securities laws, an omission must be misleading; in other words, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.

*Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir.2002). Defen-

---

**10.** Most of the cited statements in the Annual Report are forward-looking. Forward-looking statements are those that contain a projection of revenues, income, financial items, or a statement of future economic performance. 15 U.S.C. § 78u–5(i)(1). Defendants are shielded from liability for a forward-looking statement unless it was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u–5(c)(1); *In re SeeBeyond,* 266 F.Supp.2d at 1162–63. Because Plaintiffs have not shown that the forward-looking statements are false or misleading, the Court need not consider whether Defendants had actual knowledge.

dants state, "Syncor is now profitably operating three radiopharmacies and has begun to expand into other types of medical services." This is a true statement and does not affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists. *Id.* In conformance with the Ninth Circuit's language, the Court finds that this statement regarding Syncor Taiwan is not a misleading omission.

In addition, Plaintiffs' pleadings must, as a whole, raise a strong inference the defendants knowingly or with deliberate recklessness made false and misleading statements regarding Syncor Taiwan. *Ronconi,* 253 F.3d at 429. The Syncor Defendants argue that the complaint fails to link any statement made to a particular defendant. *Syncor Reply,* at 12. Plaintiffs state generally that in Syncor's 1997 Annual Report "defendants" portrayed the company as a "growth story." *Complaint,* ¶ 117. Plaintiffs do not allege which particular defendants made the false statements.

 Plaintiffs' Complaint generally alleges that each of the individual defendants are liable for Syncor's allegedly false statements pleaded in the complaint because the statements are group published. *Complaint,* ¶ 21. Prior to the enactment of the PSLRA, the "group published" or "group pleading" doctrine allowed a presumption that false and misleading information conveyed in documents, including press releases, were made by the collective action of the officers of the corporation. *In re GlenFed, Inc.,* 60 F.3d 591, 593 (9th Cir.1995). Group pleading allows Plaintiffs to attribute statements to individual defendants based upon their corporate titles, rather than pleading facts that show that a defendant actually made, authored, or communicated a statement. *Southland,* 365 F.3d at 363. The doctrine allows a plaintiff to link defendants to alleged mis-

representations because it appears that defendants are part of a group that likely put the statements together. *Id.* However, the defendants must either participate in the day-to-day corporate activities or have a special relationship with the corporation, such as preparing and communicating group information. *In re GlenFed.,* 60 F.3d at 593.

In this Court's previous order, the Court noted that courts have struggled to determine the continued viability of the group published doctrine since the enactment of the PSLRA. *In re Homestore.com, Inc., Sec. Litig.,* 252 F.Supp.2d 1018, 1031 (C.D.Cal.2003). Courts have acknowledged that the particularized pleading requirements of the PSLRA seem to contradict the doctrine. *Id.* The Fifth Circuit, the first circuit court to address the issue, recently found that the "group pleading" doctrine did not survive the PSLRA. *See Southland,* 365 F.3d at 363–366. The Fifth Circuit relied in part on a case from the district court in the Southern District of California, *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998). *Id.* at 364–65. The Fifth Circuit concluded that group pleading cannot be reconciled with the PSLRA's requirement that Plaintiffs must plead specific facts as to each act or omission by the defendants and demonstrate that defendants possess the requisite scienter. *Id.* at 365.

The group pleading doctrine assumes scienter because of a defendant's position in the company. In the Ninth Circuit, a plaintiff must state facts giving rise to more than a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness. *In re Silicon,* 183 F.3d at 985. The Ninth Circuit has found that a plaintiff must plead in great detail facts demonstrating a degree of recklessness which strongly suggests the required degree of intent. *Id.* An assumption of scienter because of a

defendant's position does not plead facts in great detail, nor create a strong inference of deliberate recklessness. Therefore, the Court agrees with the Fifth Circuit that group pleading did not survive the PSLRA.[11] As such, the individual defendants cannot be liable for the false statements found in the complaint on a group-pleading theory.

Because the Court has rejected this doctrine, the Court does not construe allegations in the complaint against the "defendants" as a group as imputable to any individual defendant unless the connection between the individual defendant and the fraudulent statement is specifically pleaded. *Southland Secs.*, 365 F.3d at 365. Specific facts that would tie a corporate officer to a statement include a signature on a document, or allegations concerning the defendant's formulation or communication of the document. *Id.*

Plaintiffs have failed to plead specific facts tying any of the individual defendants to the statements made in the 1997 Annual Report. Rather, Plaintiffs generally allege that "defendants" made the statements. Therefore, Plaintiffs have failed to show a strong inference that the defendants knowingly or with deliberate recklessness made the false and misleading statement. *Ronconi*, 253 F.3d at 429.

Throughout the remainder of the complaint, Plaintiffs allege that additional press releases, annual reports, 10–Q reports, interviews, and conference calls contain false and misleading statements. All of the statements that pertain to the company's over-all financial results and future projections are not false or misleading for the reasons set forth above. Only those statements that specifically relate to Syncor Taiwan are potentially false or misleading, and only those statements that Plaintiffs have identified and supported with particularity. To be false or misleading, any omissions must affirmatively create an impression of a state of affairs that differs in a material way from one that actually exists. *Brody,* 280 F.3d at 1006.

One statement regarding Syncor Taiwan occurred in Syncor's 1999 Annual Report. When discussing the company's international future potential, the report states, "Syncor is now the leading provider of radiopharmacy services in Taiwan." *Complaint,* ¶¶ 159, 160. Defendants Monty Fu and Funari signed this statement on or about March 31, 2000. A signature on an annual report sufficiently ties a corporate officer to a statement. *Southland Secs.,* 365 F.3d at 365. The Court found *supra* that Plaintiffs' facts support that Monty Fu and Funari had knowledge of the illegal payments. Therefore, their misleading statements regarding Syncor Taiwan's success were made with either knowledge or deliberate recklessness. However, the statement does not affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists. Therefore, it is not misleading under *Brody. Brody,* 280 F.3d at 1006.

On April 25, 2001, subsequent to the release of its quarterly results, Syncor held a conference call for analysts, money and portfolio managers, institutional investors and large Syncor shareholders. *Complaint,* ¶ 183. Defendants Funari and Bagerdjian participated in the conference call.[12] During the call, Defendants stated,

---

**11.** Plaintiffs argue that Congress did not clearly abolish the group published presumption and therefore it survived the PSLRA. *Opposition,* at 46–47. The Fifth Circuit addressed this issue and remarked that the group pleading doctrine was a judicial, rather than legislative creation, and therefore Congress did not need to explicitly abolish it. *Southland,* 365 F.3d at 364.

**12.** "Guttman" also participated in the call, but he is not a defendant in the case.

"We are confident that our Taiwan businesses will meet their fiscal year 2001 operating commitments;" "We expect that Taiwan will return to normal levels of operation on a full-year basis;" "We expect Syncor Overseas profits to contribute to the improvement of our new business-generated revenues, and Taiwan improvements in coming quarters;" "Regarding Taiwan, I want to reassure you that we will not be needing to adjust the financial numbers. Business in Taiwan itself will substitute for whatever shortfall ... we have initiatives on the way to overcome whatever shortfall we will have in that market ... we are taking steps to overcome whatever shortfall that same-store growth represents." *Id.* ¶¶ 183–84.

All of these statements relate to the status of business at Syncor Taiwan. They are not misleading because they do not affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists. *Brody,* 280 F.3d at 1006. In addition, the statements are forward-looking statement and would be protected unless made with actual-knowledge that they are false or misleading. 15 U.S.C. § 78u–5(c)(1); *In re SeeBeyond,* 266 F.Supp.2d at 1162–63.

Syncor held a subsequent conference call for analysts, money and portfolio managers, institutional investors, and large Syncor shareholders on October 24, 2001. *Complaint,* ¶ 193. At that conference call, Defendants stated that a new PET imaging center and MRI site in Taiwan "will improve our revenues coming from Taiwan in the fourth quarter of 2001." *Id.* Plaintiffs allege that the statement is false or misleading. *Id.* ¶ 195. Plaintiffs fail to state which defendants made the statement. Thus the Court will not impute the statement to any individual defendant in the absence of factual support. In addition, the statement is a forward-looking statement and would be protected unless

made with actual-knowledge that it is false or misleading. 15 U.S.C. § 78u–5(c)(1); *In re SeeBeyond,* 266 F.Supp.2d at 1162–63.

Plaintiffs also refer to press releases in which Syncor indicated that it was repurchasing stock. *Complaint,* ¶¶ 136, 147, 202. Following each press release, Plaintiffs state, "The repurchase of the stock by the company while the Individual Defendants' sold their own stock constitutes a manipulative and deceptive device in violation of § 10(b) and Rule 10b–5." *Id.* ¶¶ 137, 148, 203. Plaintiffs fail to plead particularized facts indicating that the repurchases corresponded in any way with individual sales. These conclusory allegations do not support a claim of violations of section 10(b) and Rule 10b–5.

In summary, the Court finds that Plaintiffs sufficiently alleged that Funari, Bagerdjian, and Monty Fu failed to disclose the illegal payments made by Syncor Taiwan with either deliberate or conscious recklessness. However, Plaintiffs have failed to plead that any of the statements are false or misleading. The omissions regarding Syncor Taiwan do not affirmatively create an impression of a state of affairs that differs in a material way from one that actually exists. With regard to the other individual defendants, the complaint when taken as a whole fails to allege scienter. Nor does the complaint link the other defendants to any particular false or misleading statement. The pleadings fail to satisfy the PSLRA requirements.

**B. Section 20(a)**

Plaintiffs' complaint states that Defendants violated section 20(a) of the 1934 Act. 15 U.S.C. § 78t(a). Section 20(a) provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith

and lack of inducement. *Id.; America West,* 320 F.3d at 945.

In order to prove a prima facie case under section 20(a) a plaintiff must prove 1) a primary violation of federal securities law, and 2) that the defendants exercised actual control or power over the primary violators. *America West,* 320 F.3d at 945. Control is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id. citing* 17 C.F.R. § 230.405.

In this case, the Court has found that Plaintiffs have failed to plead violations of section 10(b) and Rule 10b–5. Therefore, Plaintiffs cannot prevail on the first prong of the section 20(a) requirements. The Court dismisses the section 20(a) claim.

### C. Dismissal

When determining whether to dismiss a case with prejudice, the Court should consider several factors. *Eminence Capital,* 316 F.3d at 1052. These factors include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Eminence Capital,* 316 F.3d at 1052.

In this case, Plaintiffs have twice failed to allege facts supporting that any of the individual defendants other than Monty Fu, Funari, and Bagerdjian, had the requisite degree of scienter.[13] In granting the first motion to dismiss, the Court informed Plaintiffs that their complaint was deficient

because it failed to plead particularized details supporting that the defendants acted with the requisite scienter. Plaintiffs responded with a 219 page complaint which contains additional details. However, Plaintiffs still fail to allege any facts to support that the individual defendants knew of the actual payments, other than Monty Fu, Funari, and Bagerdjian.

Plaintiffs stated in oral argument that the Court's order gives them new guidance because of its finding that the group pleading doctrine does not survive and with regard to a section 20(a) claim. However, Plaintiffs' amended complaint would have failed to meet the pleading requirements under the previous group pleading doctrine, which required a showing that the defendants had an active role in the day-to-day management of the corporation. *In re Homestore.com,* 252 F.Supp.2d at 1031. The Court's holding that the group pleading doctrine does not exist will not assist Plaintiffs in pleading scienter or falsity. In addition, the Plaintiffs must allege a securities violation to make a section 20(a) claim, which they have not done as to any of the individual defendants.

Therefore, the Court finds that it would be futile for Plaintiffs to amend the complaint with regard to the following individual defendants: Oki, Wagner, Wilensky, Ward, Coffey, Coop, Lach, Baumann, Mikity, and Forster. Requiring these defendants to continue to appear would create an undue burden upon them.

### V. CONCLUSION

Plaintiffs have not satisfied the heightened pleading requirements of the PSLRA. Therefore, the Court hereby:

- **grants** the Outside Defendants' motions to dismiss with prejudice. This

---

**13.** The Court does not consider the merits of
the claims against Moses Fu in this motion.

includes defendants Oki, Wagner, and Wilensky;

- **grants** the Syncor Defendants' motion to dismiss. The motion is dismissed with prejudice as to Ward, Coffey, Coop, Lach, Baumann, Mikity, and Forster;

- **grants** Monty Fu's motion to dismiss.

**IT IS SO ORDERED.**